**Dennis LaFaine FLANAGAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 60580.**

Court of Criminal Appeals of Texas, Panel No. 1.

Dec. 22, 1982.

On Rehearing Sept. 19, 1984.

Robert A. Flynn, Dallas, for appellant.

Henry Wade, Dist. Atty. and Anne B. Wetherholt, Maridell Templeton, Lee Hight and Dan Garrigan, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before ROBERTS, DALLY and TEAGUE, JJ.

## OPINION

TEAGUE, Judge.

This is an appeal from a conviction for committing the offense of attempted murder. After a bench trial on a plea of not guilty, appellant was found guilty and the trial judge assessed his punishment at 20 years' confinement in the penitentiary.

Because the appellant challenges the sufficiency of the evidence to sustain the verdict of the trial court, it is necessary that we review the evidence. Before doing so, however, we point out that the indictment, omitting the formal introductory and concluding portions, alleges:

\*     \*     \*     \*     \*     \*

... that one, DENNIS LAFAINE FLANAGAN hereinafter styled Defendant, on or about the 18 day of April in the year of our Lord One Thousand Nine Hundred and 77 in the County and State aforesaid, did unlawfully, then and there, with the specific intent to commit the offense of murder, attempt to cause the death of Jerry M. Rhodes, an individual, by knowingly and intentionally shooting at Jerry M. Rhodes with a shotgun, said act amounting to more than mere preparation that tended but failed to effect the commission of the offense intended.

\* \* \* \* \* \*

It was thus incumbent upon the State to prove beyond a reasonable doubt each of the following elements:

(1) Appellant

(2) With the specific intent to commit the offense of murder

(3) Attempted to cause the death of Jerry M. Rhodes

(4) By knowingly or intentionally shooting at Jerry M. Rhodes

(5) With a shotgun

Jerry M. Rhodes, a Dallas police officer, testified that he got off duty at 12:30 o'clock a.m. on the day in question. He then proceeded in his pickup motor vehicle to his residence. While traveling in his pickup truck on R.L. Thornton Freeway in Dallas, Rhodes observed an automobile that was traveling in the same lane of traffic he was in. The automobile was approximately 75 to 80 feet in front of him. Rhodes was traveling between 50 and 60 miles per hour throughout the times mentioned herein. His attention became attracted to the other vehicle due to the erratic movements the vehicle was making, which included weaving on the freeway. When Rhodes' vehicle was approximately 50 feet from the other vehicle, he "noticed what appeared to [him] to be a shotgun blast [from the passenger side of the other vehicle] go toward the front of [his] vehicle." Rhodes testified: "It appeared to me that a gun had been shot toward the front or east of me fired forward." Thornton Freeway, where this occurred, is a four-lane roadway. Rhodes, who identified appellant as the person who fired the shotgun, testified that appellant "was sticking part of his body out of the vehicle, out of the window." Rhodes testified that appellant fired the shotgun "directly at me". However, Rhodes did not sustain any type injuries. Pellets from the firing of the shotgun struck only the front of the pickup, causing very minor damage to the center of the grill and the hood. Rhodes also testified that in his opinion the shotgun, which was not offered in evidence, was a "single barrel shotgun." The spent shell, which was not recovered, was described by him as "a green shotgun shell." In Rhodes' opinion, the damage done to his vehicle "was done by birdshot. Sounded like little B-B's hitting it or something." He also testified that the shotgun blast placed him in fear of his life and "scared him", which, of course, is understandable. Only one shot was fired from the shotgun.

Although armed with his police pistol, Rhodes did not attempt to use it, because other vehicles were traveling on the freeway and business establishments were located nearby on the feeder road to the freeway.

After the shotgun blast, Rhodes continued traveling on the freeway in the same direction as the other vehicle. After traveling approximately fifteen blocks, the other vehicle slowed down and Rhodes passed it. Both vehicles, however, continued traveling in the same direction until Rhodes turned off the freeway at the Interstate 20 exit. At that time, the driver of the other vehicle began to accelerate the speed of his vehicle. Rhodes, however, maintained the other vehicle in his view and wrote down a partial license plate number. He then continued traveling to his residence. After arrival, he called the Mesquite Police Department and reported the incident to that law enforcement agency. Later that morning, he went to the Mesquite Police Department where he saw the appellant and another person, apparently appellant's brother, in custody. At the police station he identified appellant as the person who fired

the shotgun. Prior to the night in question, he had never before seen the appellant.

Although Rhodes testified that he had had experience with shotguns, he was unable to express an opinion as to whether a shotgun, using birdshot, that was fired at a distance of 50 feet, would "break the windshield of a car." However, the evidence and testimony showed that no damage was done to the windshield of the pickup truck.

Charles A. Golden also testified for the State and he testified that near the time of the incident involving Rhodes, at another location, he observed *an unidentified person* "hanging out the window [of an automobile] with a shotgun. He was holding it about like this, you know, hanging out the window just holding the gun like this."[1] Golden relayed over his "CB" radio, to unnamed friends[2] with whom he was conversing at the time, a message of what had happened. "Well, I told them what had happened and I gave the license number three or four times, you know, to make sure it was understood." Golden was not asked, nor did he testify as to the description of the other vehicle, the description of the persons in the other vehicle, or what the license number was that he gave to "them".

Appellant also testified. He admitted he was in the vehicle described by Rhodes. However, he testified it was his brother who was displaying and "shooting [a shotgun] *at the lights on the roadway.*" (Emphasis added) Appellant also testified as follows:

Q: (Mr. Hight, the prosecutor): It's your testimony that essentially everything we've talked about here did happen. It was just your brother and it wasn't you?

A: (Appellant): Yes, sir.

We are confronted at the outset with the following factual question:

Whether the shooting of a single barrel shotgun by a person in one motor vehicle toward another vehicle, a pick-up truck, with both vehicles traveling between 50 and 60 miles per hour at the time, with the distance between the vehicles being approximately 50', with the shell described as containing birdshot, with the birdshot striking approximately the center of the front grill of the other vehicle and doing very minor damage, is sufficient evidence to sustain the element of the specific intent to kill the driver of the second or other vehicle, who did not sustain any bodily injuries?

Based upon the above facts, we answer the question in the negative, and hold that the evidence presented by the State in this cause is insufficient to show that appellant had the specific intent to kill Rhodes when he fired the shotgun.

To support the conviction, the State relies on several general principles of law, i.e., a shotgun is a deadly weapon per se, see *McClennon v. State,* 492 S.W.2d 524 (Tex.Cr.App.1973); *Stallings v. State,* 476 S.W.2d 679 (Tex.Cr.App.1972); *Burks v. State,* 165 S.W.2d 460 (Tex.Cr.App.1942), and the intent to commit murder may be inferred from the use of a deadly weapon per se. We agree with the State that those are sound and reasonable principles of law. However, whether a valid inference from a given set of facts, where one person shoots at another with a shotgun, may be deduced to reflect a specific intent to kill depends upon the factual context in which the shooting occurred. "Simply because a man shoots at another [with a shotgun] does not necessarily make it an assault with intent to murder." *Cooper v. State,* 60 Tex.Cr.R. 411, 132 S.W. 355 (1910); *Montalvo v. State,* 31 Tex. 63 (1868). "The element of the manner of use of such weapon must always be taken into consideration. A shotgun [fired at such] range as to make it reasonably apparent that death or serious bodily injury could not result from its use

---

1. As to what "like this" actually means, we are unable to say, because the statement, "Like this", is all that is in the record before us.

2. The persons Golden spoke to over his "CB" radio did not testify.

would not be legally a deadly weapon. *Scott v. State*, 46 Tex.Cr.R. [315] 317, 81 S.W. 952." *Medford v. State*, 86 Tex.Cr.R. 237, 216 S.W. 175, 177 (1919). See also *Burks v. State*, supra; *Cooper v. State*, supra; *King v. State*, 166 Tex.Cr.R. 230, 312 S.W.2d 677 (1958); *Neal v. State*, 534 S.W.2d 675, 676 (Tex.Cr.App.1975). If the type of shot fired from a shotgun is incapable of inflicting death, the mere firing of the shotgun by one person at another will not, without more, permit the inference that the shotgun was fired with the specific intent to kill.

It is therefore clear from the above decisions of this Court that before the specific intent to cause the death of another person may be inferred from the firing of a shotgun by one person at or toward another person, it must additionally be shown that the firing of the shotgun occurred with the capacity and under such circumstances as are reasonably calculated to produce the death of the other person. However, each case must be viewed in its own setting. In that regard, compare the facts of this cause with those found in *Tapley v. State*, 158 Tex.Cr.R. 495, 256 S.W.2d 583 (1953).

Cases which this Court has reversed, because the evidence was ruled insufficient to sustain the element of specific intent to kill, where one person fired a shotgun at another, are highly instructive. Notwithstanding that the facts in the case at bar and those stated in *Burks v. State*, supra, are different, we find what this Court stated in that decision is applicable to this cause. In *Burks*, the defendant was convicted on a plea of guilty to the charge that he had committed the offense of assault with intent to murder. Trial was to the court. Although the defendant had pleaded guilty to the charge, the issue on appeal concerned whether the evidence was sufficient to sustain the plea, and, in turn, the verdict rendered by the trial judge. This Court held that the evidence was insufficient to sustain the plea and ordered the conviction reversed. The facts as set out in the opinion reflect that the defendant fired a shotgun at another person at a distance of 75 feet. When the shot-pattern reached the intended victim it had spread sufficiently that one of the shot penetrated the victim's hat while another shot entered a shirt sleeve of the victim. However, the victim was uninjured. This Court held that the trial judge was not authorized to render the judgment of conviction because the evidence was insufficient to establish that the defendant had the necessary intent to kill his victim. In arriving at its result, this Court stated in the abstract and applied to the cause several rudimentary principles of law, namely:

> If appellant shot Mitchell with no intent to kill him, he would not and could not be guilty of assault with intent to murder, because a specific intent to kill is an essential ingredient of that offense. Such is made so by the statute ... The instrument with which the assault is committed may be looked to in determining the grade of assault. Ordinarily, when an assault is committed with a deadly weapon, the intent to kill may be inferred ... The instrument used in the instant case being a shotgun, it was, in the manner used, a deadly weapon per se. But to shoot at another with a gun does not necessarily constitute an assault with a deadly weapon or an assault with intent to murder. The shot must be fired under such circumstances as are reasonably calculated to produce the result intended. Hence if the intended victim be at such a distance as to be out of range of the gun, the intent to kill may be lacking.

See also, *Neal v. State*, supra.

In the instant case, the only evidence of appellant having the specific intent to cause the death of Rhodes, a required element of the offense of attempted murder, is the firing of the shotgun toward the vehicle driven by Rhodes, which was then traveling between 50 and 60 miles per hour, with pellets from the blast only striking the front part of Rhodes' vehicle. Yet, there is no testimony or evidence that this shotgun, which was fired from "approximately fifty feet", was capable of causing death. The actual damage Rhodes' vehicle

sustained was two "B.B." sized dents in the front grill and some chipped paint in the hood. There was no damage done to the front windshield of the vehicle. Rhodes did not sustain any bodily injuries. The minor damage done and the lack of injuries indicates to us that "this" shotgun blast, at least at the stated range and under the circumstances, was not capable of causing death. Furthermore, when the shotgun was fired, Rhodes was shown to be within the cab of the pickup truck, which also indicates to us that because of the distance between the vehicles he had a certain amount of protection from being physically struck by the pellets which came from the shot fired from the shotgun. The shotgun that appellant fired was never offered in evidence and there is not any showing by the State to account for its whereabouts, although the facts inferentially show that both appellant and his brother were arrested together at an unknown time and place by unknown officers of the Mesquite Police Department not very long after the incident involving Rhodes took place. Rhodes also testified that after the shooting occurred, he observed the spent shell casing bounce on the freeway, but he never made any effort to recover it. Thus, we are without testimony or evidence to show the size, weight, or what type shot was in the shell casing. Rhodes did testify, however, that in his opinion the shot consisted of pellets and not lead balls.

Although we find the conduct of appellant reprehensible, we are, nevertheless, unable to conclude from the facts and circumstances presented that the State proved beyond a reasonable doubt that the appellant, when he fired the shotgun, had the specific intent to kill Rhodes. Although this Court is duty bound to review a sufficiency of the evidence claim in a light most favorable to the verdict of the fact finder, see *Johnson v. State*, 93 Tex. Cr.R. 150, 245 S.W. 710, 711 (1922); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we are also Constitutionally bound to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.

"... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, no. 12, 99 S.Ct. 2781, 2789, no. 12, 61 L.Ed.2d 560 (1979). See also *Griffin v. State*, 614 S.W.2d 155 (Tex.Cr.App.1981). Applying that standard to the case before us, we hold that the State has failed to present sufficient evidence of specific intent to kill Rhodes.

The judgment is reversed. No further prosecution shall be had for the offense of attempted murder of Rhodes, but should the State determine that the appellant is guilty of a lesser included offense of attempted murder of Rhodes it is free to prosecute the appellant for committing that offense. See *Rogers v. State*, 575 S.W.2d 555, 559 (Tex.Cr.App.1979); *Moss v. State*, 574 S.W.2d 542 (Tex.Cr.App.1978).

DALLY, J. concurs.

Before the court en banc.

## OPINION ON STATE'S MOTION FOR REHEARING AND ON COURT'S OWN MOTION FOR REHEARING

MILLER, Judge.

On original submission, a panel of this Court held that the evidence in the instant cause was insufficient to show that the appellant, who was convicted of attempted murder, had the specific intent to kill.

The State argues in its motion for rehearing en banc that since the offense of murder under V.T.C.A. Penal Code, § 19.-02(a)(2), does not require that a person have the specific intent to kill, the panel was incorrect in engrafting such intent into the offense of attempted murder. As authority for its argument, the State refers us to *Baldwin v. State*, 538 S.W.2d 615 (Tex.Cr.App.1976), and *Garcia v. State*, 541 S.W.2d 428 (Tex.Cr.App.1976). After careful reconsideration, we find the *Baldwin* analysis to be incorrect and will accordingly deny the State's Motion for Rehearing.

Nevertheless, although the State did not directly attack the holding of the panel opinion that the evidence was insufficient to show an intent to kill, we will en banc on our own motion, also reconsider that holding, find it erroneous, and affirm the judgment of the trial court.

## I.

### INTENT REQUIRED TO COMMIT ATTEMPTED MURDER

■ We will first address the issue raised by the State on rehearing.

Prior to the 1973 enactment of the new penal code, Texas had neither a general attempt statute similar to V.T.C.A. Penal Code, § 15.01,[1] nor a statute which authorized a conviction for murder when only an intent to cause serious bodily injury exists as is now found in V.T.C.A. Penal Code, § 19.02(a)(2).[2]

Although a specific intent to kill had been an essential element of the old penal code offense of assault with intent to murder,[3] the question which arose in *Baldwin* was whether the new penal code's enactment of § 19.02(a)(2) now permitted a conviction for attempted murder when a person acts with only the intent to cause serious bodily injury.

In *Baldwin*, supra, in an opinion approved by the Court, Commissioner Brown found that a specific intent to kill was no longer a necessary element of attempted murder. The analysis that justified this conclusion follows:

"In order to prove murder under V.T. C.A. Penal Code, Sec. 19.02(a)(2) the State must prove that the actor first, intends to cause serious bodily injury, second, the actor commits an act clearly dangerous to human life, that, third, causes the death of an individual.

"A person commits the offense of criminal attempt under V.T.C.A. Penal Code, Sec. 15.01 if, first, with the specific intent to commit an offense he, second, does an act amounting to more than mere preparation that third, tends but fails to effect the commission of the offense intended.

"Applying the foregoing analysis to the facts of the instant case the State was required to show the following elements of attempted murder. First, that the appellant intended to cause serious bodily injury.... Second, the State was required to show that the appellant committed an act amounting to more than mere preparation.... The third element of murder is not shown because the victim in this case did not die as a result of the acts of the appellant; therefore, the appellant failed to effect the commission of the offense intended.

"*A specific intent to kill is not required under V.T.C.A. Penal Code, § 19.02(a)(2) for the offense of murder to be committed. The specific intent, therefore, required under V.T.C.A. Penal Code, § 15.01 would not be a specific intent to kill but need only be the intent to cause serious bodily injury.*" *Baldwin,* supra, at 616. (emphasis added)

This finding was reiterated by Commissioner Brown in *Garcia,* supra, and by Com-

---

**1.** V.T.C.A. Penal Code, § 15.01(a) provides:
"A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." (emphasis added)

**2.** V.T.C.A. Penal Code, § 19.02(a) provides:
"A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual;
(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

**3.** *Robertson v. State,* 426 S.W.2d 872 (Tex.Cr. App.1968); *Young v. State,* 384 S.W.2d 710 (Tex. Cr.App.1964).

missioner Keith in *Teal v. State,* 543 S.W.2d 371 (Tex.Cr.App.1976).

We initially note that § 15.01 plainly requires that a person must act "with specific intent to *commit an offense.*" (emphasis added) *Baldwin* attempts to construe that language to mean that a person may be convicted of an attempted offense when he acts "with the same intent required by the attempted offense." If that were the language of the statute, then it would follow that the intent necessary to support a conviction for attempted murder could be the same as that required by § 19.02(a)(2)—the intent to cause serious bodily injury. The statute, however, is not so worded.

Indeed, § 15.01 defines the elements of criminal attempt in traditional terms. The element "with specific intent to commit an offense" has traditionally been interpreted to mean that the actor must have the intent to bring about the desired result, which in the case of attempted murder is the death of the individual.

Thus, a specific intent to kill is a necessary element of attempted murder. The authorities in support of this interpretation are numerous and convincing. See R. Perkins and R. Boyce, Criminal Law 637 (3rd ed. 1982);[4] C. Torcia, 4 Wharton's Criminal Law 565 (4th ed. 1981);[5] W. LaFave and A. Scott, Jr., Criminal Law 428 (1972);[6] Notes, *Attempted Murder: Should Specif-*

*ic Intent to Kill be Required?* 31 Baylor L.Rev. 243 (1979).

Moreover, the *Baldwin* conclusion leads to a potential overlap between the offenses of aggravated assault and attempted murder. Judge Odom correctly observed in his concurring opinion in *Dovalina v. State,* 564 S.W.2d 378, 385–86 (Tex.Cr.App.1978) that:

"*Baldwin* misconstrued the requirement of a specific intent *to commit an offense* by stating that the accompanying specific intent to cause serious bodily injury, required for murder under Sec. 19.-02(a)(2), would suffice. [emphasis in original] Such intent to cause serious bodily injury is not the same as the intent to commit the offense of murder. A killing under Sec. 19.02(a)(2) is murder notwithstanding the fact that no murder was intended. And for precisely that reason, Sec. 19.02(a)(2) may not support an attempted murder prosecution: A prosecution for an attempted offense will lie only if there is an intent to commit such attempted offense. *The intent to cause serious bodily injury relied on in Baldwin and Garcia, supra, is the intent to commit aggravated assault under Sec. 22.02(a)(1), supra, and if such intent accompanies an act that tends but fails to effect serious bodily injury, the offense is attempted aggravated assault, not attempted murder.* [empha-

**4.** "The word 'attempt' means to try; it implies an effort to bring about a desired result. Hence an attempt to commit any crime requires a specific intent to commit that particular offense.... The fallacy in [the statement that an act which would be sufficient for murder if death results should be attempted murder if life is not taken] is that while a person may be guilty of murder though there was no actual intent to kill, he cannot be guilty of an *attempt* to commit murder unless he has a *specific intent to kill.*'" (emphasis added). Perkins & Boyce, supra at 637–638.

**5.** "To constitute an attempt, there must be an intent to commit a particular crime.... Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." Wharton's Criminal Law, supra at 571–572.

**6.** "Some crimes, such as murder, are defined in terms of acts causing a particular result plus

some mental state which need not be an intent to bring about that result. Thus, if *A, B,* and *C* have each taken the life of another, *A* acting with intent to kill, *B* with an intent to do serious bodily injury, and *C* with a reckless disregard of human life, all three are guilty of murder because the crime of murder is defined in such a way that any one of these mental states will suffice. However, if the victims do not die from their injuries, then only *A* is guilty of attempted murder; on a charge of attempted murder it is not sufficient to show that the defendant intended to do serious bodily harm or that he acted in reckless disregard for human life. [emphasis in original.] Again, this is because intent is needed for the crime of attempt, so that *attempted murder requires an intent to bring about that result described by the crime of murder (i.e., the death of another).*" (emphasis added) LaFave & Scott, supra at 428–429.

sis added] If the act does cause serious bodily injury, the offense is aggravated assault, not attempted murder. Sec. 19.-02(a)(1) is the only form of murder that requires an intent to murder, and since Sec. 15.01(a) requires intent to commit the offense attempted, only Sec. 19.-02(a)(1) will support attempted murder."

See also Notes, *Attempted Murder: Should Specific Intent to Kill be Required?* 31 Baylor L.Rev. 243 (1979).

Furthermore, if we were to apply the *Baldwin* interpretation of § 15.01 to the remaining subsection of § 19.02, other offenses would potentially overlap, such as attempted murder and robbery. For instance, is a person who is in the immediate flight from the commission of a robbery and who commits an act that is clearly dangerous to human life, such as driving his "getaway" car the wrong way down a one-way street, guilty of attempted murder even though no one is killed or even injured? According to the *Baldwin* analysis, the only intent necessary to commit attempted murder would be the intent required by § 19.02(a)(3) which in this instance would be the intent required to commit the robbery. We contend the Legislature did not intend for § 15.01 to have such absurd results.

We can only conclude that the cursory analysis of this issue in *Baldwin,* which was blindly followed by *Garcia* and *Teal,* supra, was erroneous and obiter dicta.[7]

For the reasons discussed and contrary to the State's contention, attempted murder can only be committed by a person who has the intent to commit or complete the offense of murder, *viz.,* the intent to kill. *Baldwin, Teal,* and *Garcia* are overruled

to the extent they conflict with this holding.

The State's motion for rehearing is denied.

## II.

### SUFFICIENCY OF THE EVIDENCE

We next address the issue which was not raised in the State's brief on rehearing but which will be considered on our own motion en banc. We find the panel opinion incorrectly held the evidence was insufficient to prove that the appellant had the specific intent to kill.

The complainant, Dallas Police Officer Jerry M. Rhodes, testified that on the morning of April 18, 1977, around 1:00 a.m., he was driving his pickup truck down R.L. Thornton Freeway in Dallas when he observed the car in the lane just ahead of him weaving in and out of its lane. He next observed the front seat passenger stick part of his body out of the window and fire a shotgun toward the front of the car. Rhodes then testified:

"Q. What happened after that?

"A. Shortly thereafter we continued eastbound. I was behind the vehicle, I noticed the subject I believed had done the firing turn around and look at me. He stuck his body outside of the car."

"Q. When he turned to look at you was he looking through the rear glass while inside the car or what?

"A. No, sir. He stuck his body, his upper part of his body outside of the car hanging from the passenger window and turned around and

---

7. The facts in each of the three cases would clearly have supported a finding of the specific intent to kill. The defendant in *Baldwin* was armed with a three and a half foot length of pipe, which he used to hit the victim several times on the head and arms, even after the victim had fallen to the ground. The victim's skull was fractured during the assault, which necessitated immediate surgery to remove bone fragments from the brain and further surgery to insert a metal plate in the skull; at the time of trial, the victim still suffered from partial paralysis to his right hand as a result of the assault. In *Garcia,* supra, the defendant fired his .22 pistol several times at two people, hitting one in the abdomen. In *Teal,* the defendant pulled a pistol, pointed it between the victim's eyes, and pulled the trigger. When the pistol failed to fire the first time, the defendant continued to pull the trigger, successfully firing several shots, one hitting the victim.

looked at the vehicle behind him which was me.

"Q. How much of his body was protruding out of the passenger window?

"A. Probably about a third of it.

"Q. The area around the navel or above?

"A. Right, yes, sir.

"Q. What did you then see him do?

"A. I saw him sit back down in the vehicle and reach in the back seat, pick up something that I didn't know what it was. I was approximately fifty feet behind him. I saw him again stick part of his body out of his car and I noticed that he had a gun in his hand and the gun was fired at me.

"Q. What type of gun was this?

"A. This was a shotgun.

"Q. When you say he fired a gun at you, you mean fired it directly at you?

"A. Yes, sir. *He fired it directly at me.* [emphasis added]

"Q. It wasn't like he was trying to shoot your tire or anything like that?

"A. No, sir.

"Q. This is how great a distance?

"A. Approximately fifty feet."

\* \* \* \* \* \*

"Q. When the shots were fired were they fired directly at you or at another part of the pickup?

"A. They were fired directly at me.

"Q. The muzzle of the shotgun was pointed directly at you when the blast was fired?

"A. Yes, sir."

Under cross-examination, Rhodes further explained:

"Q. And you said that he aimed the shotgun right at you. In other words, right at your body, driving the truck?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. The only reason that you believe that they attempted to murder you was the fact that you saw the shotgun aimed at you and the trigger pulled?

"A. I saw the shotgun aimed at me and the shotgun was fired at me.

"Q. That is the only reason you believe they attempted to or had any idea of killing you or murdering you at all?

"A. That's correct.

"Q. And in fact the only damage to your vehicle was some place removed from where you were sitting and driving?

"A. The damage is to the front of my vehicle, the front of my truck. There is no concentrated damage on it whatsoever, but I was in front of my truck driving it."

After the second shotgun blast, Rhodes passed the car, which had slowed down to about thirty-five miles per hour. He eventually exited the freeway at a spot where he felt he could drive into a service station and call the police if the other car attempted to follow him off the freeway. The other car, however, continued to travel down the freeway after Rhodes exited. Rhodes testified that while he was still on the freeway he wrote the license plate number of the car on his hand, mistaking one of the six digits. After exiting, he called the Mesquite Police Department to report the incident, describe the car and the two individuals in the car, and relay the license plate number. The next morning, Rhodes went to the Mesquite Police Department, where he had been told two suspects had been arrested, and identified appellant as the person who had fired the shotgun.

The appellant testified that although he was in the car on the night in question, he was the driver of the car. His brother, who was the passenger, was drunk and was firing a shotgun out the window of the car in an attempt to hit the lights. Appellant testified he had no knowledge of any at-

tempt to shoot at Rhodes' pickup. His brother did not testify at trial.

■ The specific intent to kill may be inferred from the use of a deadly weapon, *Bell v. State,* 501 S.W.2d 137 (Tex.Cr.App. 1973), and a shotgun is a deadly weapon per se, *Stallings v. State,* 476 S.W.2d 679 (Tex.Cr.App.1972), unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result, *Medford v. State,* 86 Tex.Cr.R. 237, 216 S.W. 175, 177 (1919); *Hatton v. State,* 31 Tex.Cr.R. 586, 21 S.W. 679 (1893). For example, in *Scott v. State,* 46 Tex.Cr.R. 315, 81 S.W. 952 (1904), where the defendant fired a shotgun loaded with bird or squirrel shot at the complainant who was some 125 to 200 *yards* away, this Court held that it was not possible that any serious injury could have been inflicted and thus the shotgun was not in the manner of its use a deadly weapon. See also, *Barnes v. State,* 172 Tex.Cr.R. 303, 356 S.W.2d 679 (1961); and *Hargrove v. State,* 501 S.W.2d 878 (Tex.Cr.App.1973).

■ Applying the above rules to the facts in the instant case, the panel opinion found that the "firing of the shotgun did not occur with the capacity and under such circumstances as are reasonably calculated to produce the death of the other person", and that the evidence was insufficient to prove beyond a reasonable doubt that the appellant had the specific intent to kill. On rehearing, we find that the panel opinion failed to consider the totality of the facts before reaching its conclusion. The issue considered by the panel in this case was phrased as follows:

> "Whether the shooting of a single barrel shotgun by a person in one motor vehicle toward another vehicle, a pick-up truck, with both vehicles traveling between 50 and 60 miles per hour at the time, with the distance between the vehicles being approximately 50', with the shell described as containing birdshot, with the birdshot striking approximately the center of

the front grill of the other vehicle and doing very minor damage, is sufficient evidence to sustain the element of the specific intent to kill the driver of the second or other vehicle, who did not sustain any bodily injuries?" Panel opinion at p. 737.

If the facts as posed in the above question were all that had been presented by the State in support of the element of intent, our holding might be different. In the instant case, however, Rhodes specifically testified that the appellant saw him, picked up the shotgun, and *aimed the shotgun directly at him* before pulling the trigger. Accordingly, the question of appellant's intent to kill, under a traditional sufficiency of the evidence analysis, should be:

> whether any rational trier of fact could find beyond a reasonable doubt that Dennis LaFaine Flanagan had the intent to kill Jerry Rhodes when he reached into the backseat of the car he was traveling in and picked up a shotgun, leaned out the window of the car as it traveled between 50 and 60 miles per hour, *aimed the shotgun muzzle directly at Jerry Rhodes who was driving a pickup truck about 50 feet behind him, and pulled the trigger of the shotgun causing it to fire?*

Under this analysis, there is clearly sufficient evidence to support the trial court's finding. Appellant's act of pointing and firing the shotgun directly at Rhodes, who was driving a car only 50 feet behind him, demonstrates that it was his "conscious objective or desire" to cause the death of his target.[8]

The panel opinion's reliance on *Burks v. State,* 145 Tex.Cr.R. 15, 165 S.W.2d 460 (1942), for authority to support its conclusion is misplaced for several reasons. The Court in *Burks* was faced with the situation wherein the defendant had pled guilty and then in support of his application for a

---

8. V.T.C.A., Penal Code, Sec. 6.03, provides:
  "(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

suspension of sentence the State elicited testimony from the defendant denying that he had intended to kill the complainant. The question then was whether the trial court should have withdrawn the defendant's plea of guilty and entered a not guilty *plea* (not verdict) since the evidence raised the lack of intent on the part of appellant. The Court did not hold that the evidence was "insufficient to establish that the defendant had the necessary intent to kill his victim", see panel opinion at p. 738, but rather that the defendant's testimony "reasonably and fairly" presented an issue of fact as to the defendant's intent. *Burks,* supra 165 S.W.2d at 464. Thus the trial court could not, under the law, accept his *plea* of guilty. The Court did not hold that the trial court could not have found the defendant guilty under the same evidence if the defendant's plea had been not guilty. To the contrary, the Court specifically found that the State had satisfied its burden of introducing evidence sufficient to show the defendant was guilty by the testimony of the complainant that the defendant had fired a shotgun at the complainant from about 75 feet away. *Burks,* supra at 464. Accordingly, the result in *Burks* would presumably have been different if the issue had not been raised during testimony on a guilty plea and if the State had not elicited from the defendant testimony specifically denying his intent to kill.

We find that the decision in *Burks* not only does not support the appellant's position, but is actually antipodal. A rational trier of facts would not be irrational in concluding that appellant manifested an intent to kill Rhodes by reaching for, pointing, and shooting the shotgun directly at

him from 50 feet away.[9] Appellant's first ground of error is overruled.

### III.

### REMAINING GROUNDS OF ERROR

We will next address appellant's remaining grounds of error.

■ In his second ground of error, appellant contends that the evidence was insufficient to identify appellant as the man who fired the shot.

Officer Rhodes testified that prior to the shooting he observed appellant lean the upper third of his body out of the car and turn directly toward him. He described the lighting conditions on the freeway as "pretty well plus my headlights had illuminated his vehicle." He also testified that he got a good look at the subject, who was only 50 feet away. The next morning, Rhodes testified he went to the Mesquite Police Department and observed the following:

"A. Mr. Flanagan, Dennis Flanagan was sitting in a chair when I walked in to a little booking area there. I approached an Officer O'Neal of the Mesquite Police Department, he told me that they had arrested the two subjects which they believed had been involved in an attempted shooting or shooting. I asked him if they had said anything to him and he said no, that Joseph Flanagan had been quite hard to get along with and was creating some problems. He asked me if I knew which one did the shooting and I said, I turned around and I said, 'Yes, sir, I know, there's no doubt in my mind,' and

---

9. We find the comments of Presiding Judge Hurt in *Hatton v. State,* 31 Tex.Cr.R. 586, 21 S.W. 679 (1893), particularly appropriate in this case:

"When in a case the question arises as to whether the accused intended to kill, the means used by him may be looked to. If a deadly weapon is used in a deadly manner, the inference is almost conclusive that he intended to kill; on the other hand, if the weapon was not a dangerous one, or was not used in a deadly manner, the evidence must be

established by other facts. But it would be a monstrous doctrine to hold that, because in fact the accused did not have the ability to kill, therefore he did not intend to kill. A. attempts to rape B., but fails, because physically unable to accomplish his purpose. A. shoots at B. with intent to kill. He fails because his gun was not true to the mark, or because his shot were not large enough to effect his purpose. To this doctrine we cannot assent."

he asked me which one and I told him, I said it was Dennis.

"Q. At that time you identified this Defendant?

"A. Yes, sir.

"Q. Dennis Flanagan is the one who had fired the shotgun at you earlier that morning?

"A. Right.

"Q. Now, was your identification of Dennis Flanagan there in the police station based on any kind of suggestions given you by the police?

"A. There was no suggestion because both Flanagan suspects had not talked to the Mesquite officer at all and I recognized Dennis from my contact with him on the freeway.

"Q. All right. You recognized him that morning and you recognize him now?

"A. Yes, sir."

The appellant, of course, testified that it was his brother who fired the shots.

The trial court was the trier of the facts, the credibility of the witnesses, and the weight to be given to their testimony and as such was free to accept or reject the testimony of any witness. The court chose to believe the State's version of the facts. *Limuel v. State,* 568 S.W.2d 309 (Tex.Cr. App.1978). The evidence as to identity was sufficient.

■ In this same ground of error, appellant appears to argue that the pre-trial identification tainted the complainant's in-court identification. Examining the identification under a totality of the circumstances test, see *Jackson v. State,* 657 S.W.2d 123 (Tex.Cr.App.1983), we note that (1) the complainant had the opportunity to view the appellant at the time of the offense from 50 feet away on a well lit freeway while the appellant was hanging out the window of the car; (2) the complainant, a trained city of Dallas police officer, carefully observed the appellant prior to, during, and after the instant offense while driving behind, next to, and in front of the appellant's car, and noted a description of the car and its occupants and a partial description of the license plate; (3) immediately after the offense, the complainant gave his description of the person who had fired the shots to the police, and nothing was presented at trial showing that the description was inconsistent with appellant's physical characteristics; (4) the complainant was unwavering and immediate in his identification of appellant as the shooter; and (5) the time between the offense and the confrontation was only a matter of a few hours. We find that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification. *Jackson,* supra.

Appellant's second ground of error is overruled.

■ In a third and multifarious ground of error, appellant contends he was denied effective assistance of counsel. He first claims that his trial counsel was surety on his bond and "It is probable that the hurry-up proceeding that Appellant went through was a result of his bond jumping one year earlier." The "hurry-up proceeding" of which appellant complains apparently consists of the trial before the court wherein counsel failed to apply for probation, waived all pre-trial motions, including the motion to suppress identification, and waived a jury trial "where Appellant might have had a chance to obtain probation if an application for probation had also been filed." Appellant also complains of counsel's failure to perfect a bill of exceptions on one matter and the "ineffectivness [sic] of trial counsel's cross-examination" illustrated by his failure to ask Rhodes the following questions:

"How do you know there were any shotgun pellets in your radiator whatsoever?

"Did you dig out the pellets from the radiator?"

The record reflects that trial counsel was surety on appellant's bond and filed an "Affidavit of Surety to Surrender Principal" approximately four months before trial because of appellant's failure to cooperate and a fear that appellant would leave

the jurisdiction of the court. Trial counsel, in an apparent effort to diffuse the effect of appellant's bond violation, also elicited at trial testimony from appellant explaining the circumstances surrounding his leaving the state while on bond and his voluntary return and surrender to the authorities. There is nothing in the record to support the claim on appeal that trial counsel was in any way prejudiced by appellant's actions or that as a result he influenced appellant to his detriment or "hurried up" the proceedings.

Although the record reflects that appellant waived his right to a jury trial, nothing in the record reflects whether this waiver was made on counsel's suggestion or at appellant's insistence or that the decision to waive a jury trial and other pre-trial motions was not a valid trial strategy on the part of appellant's trial counsel. In the face of a silent record, we decline to judge the decision on the basis of hindsight. See *Passmore v. State*, 617 S.W.2d 682 (Tex.Cr. App.1981); *Mercado v. State*, 615 S.W.2d 225 (Tex.Cr.App.1981); *Witt v. State*, 475 S.W.2d 259 (Tex.Cr.App.1971).

We also note that since the trial was before the court, there was no need for counsel to file a written request for probation. See Special Commentary, Art. 42.12, V.A.C.C.P. There is no transcription of the court reporter's notes from the punishment phase of the trial, so we cannot determine whether an oral motion for probation was made. Moreover, in light of the punishment assessed by the trial court, appellant would not have been eligible for probation. *Mercado*, supra.

Appellant also complains of trial counsel's failure to perfect a bill of exceptions on certain matters, the only example being his failure to develop facts showing that "civilian witness, Charles Golden, visited Appellant in jail and asked his name...." Appellant fails to inform us in what manner such a visit, if it occurred, was harmful to appellant and the testimony at trial certainly does not give us any idea as to what the possible prejudice might be. Golden testified that on the night of the offense he saw a man hanging out of a car window firing a shotgun. Golden, however, was unable at trial to identify the man. Moreover, there is nothing in the record to reflect that such a visit occurred. To the contrary, trial counsel specifically asked appellant if he recalled whether "some people" came to see him while he was being held at the Mesquite Police Department. Although he remembered people coming in he could not recall whether either Rhodes or Golden was there.

Finally, appellant complains of trial counsel's ineffective cross-examination at trial. We have examined the entire record and perceive no lack of effectiveness on trial counsel's part. The questions posed on appeal as examples of counsel's inadequacies appear to be of little or no significance in light of the testimony as a whole. Simply because counsel on appeal would have asked other questions or phrased some of them differently does not reflect on trial counsel's total effectiveness.

The test to be applied in determining whether counsel provided constitutionally satisfactory services is the "reasonably effective assistance" standard, based upon the totality of counsel's representation. *Passmore*, supra. See also *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). From the record before us, we conclude that appellant was provided with reasonably effective counsel.

Appellant's third ground of error is overruled.

Appellant has also written and filed in this Court a pro se brief. Appellant is not entitled to hybrid representation on appeal. We have, however, in the interest of justice examined the brief and find it to be without merit.

The judgment of the trial court is affirmed.

ONION, P.J., and McCORMICK and CAMPBELL, JJ., concur in result.

TEAGUE, Judge, dissenting.

Because I am unable to agree with the majority that the evidence is sufficient to sustain the appellant's conviction, due to the factual impossibility of appellant consummating the intended offense of murder, as well as the fact that I do not believe that any rational trier of fact could have found, under the facts that were presented, the essential elements of the crime charged beyond a reasonable doubt, see *Jackson v. Virginia,* 443 U.S. 307, 319, n. 12, 99 S.Ct. 2781, 2789, n. 12, 61 L.Ed.2d 560 (1979); *Griffin v. State,* 614 S.W.2d 155 (Tex.Cr. App.1981), I am compelled to dissent to Part II of the majority opinion.

What causes the majority's analysis to be faulty in reaching its conclusion, that the evidence is sufficient, is the fact that it directs its attention solely to the act of appellant pointing the shotgun in the direction of the complainant and then firing it. It is apparent to me, if no one else, that in resolving the issue of whether the evidence is sufficient, the majority ignores, among other things, the question, whether the type shot that was fired from the shotgun was capable of inflicting death or serious bodily injury on the complainant.

As pointed out in the panel opinion, before the evidence can be held sufficient to support a conviction for attempted murder, under such a factual situation as here, the firing of shot from a shotgun must occur with the capacity and under such circumstances as are reasonably calculated to produce the death or cause serious bodily injury to the person fired at. At least, there must be established a reasonable possibility that such could have occurred.

It is also obvious to me, if no one else, that the majority fails to come to grips with the common law defense of impossibility, which has existed since at least 1846. See *Regina v. Goodchild* (1846) 2 Cr & K 293, 175 Eng Reprint 121. Also see *In Regina v. Collins* (1864) Eng 9 Cox CC 497, which held that there can be no attempt to steal from an empty pocket.

I am of the school of thought that when the consummation of an intended crime is either legally or factually impossible, and the sufficiency of the evidence is challenged, the facts of the case must be viewed in that light, and I find that it is far from strange to view the criminality of an attempt in relation to the completed offense. Therefore, if an attempt occurs under such factual circumstances as those at bar, where it was conclusively established that it was factually impossible to consummate the intended offense, then the accused cannot be guilty of the attempted offense.

If it is the majority's intention to hold that factual impossibility cannot ever be a defense to an alleged criminal offense of attempt, it should expressly make this holding. If that is not the majority's intention, then it should expressly state that it is not eliminating from our law the defense of factual impossibility, and then explain how the evidence in this cause is sufficient to sustain appellant's conviction.

To do neither is to do a disservice to the bench and bar of this State.

*King v. State,* 312 S.W.2d 677 (Tex.Cr. App.1958), was cited in the panel opinion as authority for the conclusion that the evidence was insufficient. In *King,* supra, another case which the majority fails to acknowledge, this Court held that the evidence was insufficient to sustain a conviction for assault with intent to murder with malice aforethought, even though the facts showed that at a distance of only 25 yards the defendant fired his rifle in the direction of several police officers, "and the officers heard the bullet 'whistle' by them." Also see *Scott v. State,* 46 Tex.Cr.R. 315, 317, 81 S.W. 952 (1904); *Medford v. State,* 86 Tex. Cr.R. 237, 216 S.W. 175 (1919); and *Cooper v. State,* 60 Tex.Cr.R. 411, 132 S.W. 355 (1910).

In the instant cause, the State's only basis for establishing that when appellant fired the shotgun in the direction of the complainant's vehicle he had the specific intent to murder the complainant was the following: the mere firing of the shotgun by appellant in the direction of the vehicle

driven by the complainant was sufficient to establish the intent to murder. However, the State presented no testimony or evidence that the shot fired from the shotgun appellant fired was capable of causing death or serious bodily injury to the complainant. There is also no testimony or evidence in the record that a shotgun, using any type of shot, and fired from approximately fifty feet in the direction of a vehicle traveling between 50 and 60 miles per hour, is capable of causing death or serious bodily injury to the driver of the vehicle.

The record, however, only reflects that the actual damage the complainant's vehicle sustained was two "B.B." sized dents in the front grill and some chipped paint in the hood of the vehicle. There was also no damage to the front windshield of the vehicle. The complainant did not sustain any injuries from the gunshot.

It is common knowledge that the range of shot from a shotgun is comparatively short due to the lightness of the shot. See Moenssens, Moses and Inbau, *Scientific Evidence in Criminal Cases* 122 (1973 Edition). In this cause, no evidence was presented by the prosecution that concerns the size, weight, or what type shot was in the projectile that was fired from the shotgun. The complainant testified that in his opinion the shot fired consisted of pellets and not lead balls. See *Scientific Evidence in Criminal Cases*, supra, at page 125. I am unable to understand how, under the circumstances of this cause, the pellets fired from the shotgun were capable of causing death or serious bodily injury to the complainant, and if they were incapable of causing death or serious bodily injury to the complainant, then pray tell how could they have effectuated the intended offense?

Decisions of this Court should make it obvious to anyone that before the specific intent to cause death or serious bodily injury may be inferred from the mere act of the accused firing a shotgun at or in the direction of another person, there must additionally be established that the shot fired

from the shotgun was capable of causing death or serious bodily injury. In this instance, the State failed to present evidence on this issue. Thus, the majority errs in holding that the evidence is sufficient.

It has long been the law of this State that to constitute the crime of assault with intent to murder, there must be an attempt plus actual present ability to effectuate the intent. See *Scott v. State*, 46 Tex.Cr.R. 315, 81 S.W. 952 (1904). To put it another way: It has long been the law of this State that factual impossibility inherent in the means used has always been an affirmative defense to a charge of assault with intent to murder. I pause to point out that there is no meaningful difference between that offense and the present offense of attempted murder.

This Court should either expressly overrule all cases which have applied such rule of law or it should follow what this Court has held in the past. To do neither does not assist the bench and bar of this State.

The evidence is insufficient. To the contrary holding by the majority, I respectfully dissent.