

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0843-20

## LUCIO ZAVALA SIFUENTES, JR., Appellant

### v.

## THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE SEVENTH COURT OF APPEALS
## DEAF SMITH COUNTY

**WALKER, J., filed a concurring opinion.**

### <u>CONCURRING OPINION</u>

Appellant was convicted by a jury of attempted capital murder and sentenced to forty years in prison. On appeal, Appellant challenged the sufficiency of the evidence. The court of appeals rejected his claim. Appellant now argues in this Court that the court of appeals erred in determining the evidence was sufficient to establish that Appellant possessed specific intent to kill a peace officer, an element the State was required to prove. Because I believe the evidence is sufficient to prove specific intent, I agree with the Court's decision to refuse Appellant's petition for discretionary review. I write separately to highlight that the facts of this case present the rare

scenario where a fully-functional double-action revolver can be accidentally discharged even when the hammer has not been manually cocked.

## I.    Factual Background

Hereford Police Officer Andrew Johnston spotted Appellant walking across the street in a residential area around 3:00 A.M. and stopped him for "pedestrian in the roadway." After identifying Appellant and contacting dispatch to confirm Appellant did not have any arrest warrants, Johnston told Appellant he was going to conduct a pat down search. Moments later, Appellant took off running. As Johnston gave chase, he warned Appellant he would be tased if he failed to stop running. When Appellant continued to evade Johnston, the officer deployed his Taser. Appellant fell to the ground, and a gun that he had pulled out of his waistband while running discharged. The shot was fired away from Johnston and in the direction both men had been running.

What exactly occurred next was disputed at trial.

*Officer Johnston*'s *version*

On direct examination, Johnston testified:

Q. So once [Appellant] went down to the ground, then what did you do?

A. It happened so fast because we were at a full sprint. The moment the Taser hit him, he hits the ground immediately, and my momentum carries me up to him, and I'm right – right there with him. The moment he hits the ground, he rolls over, and that's when –

. . .

Q.  . . . and then he went to the ground. And then a little time later, he rolled over; is that correct?

A. He immediately rolled over. As -- as I got up on him, he rolled over.

. . .

Q. And so he rolled over. And once the Defendant rolled over, what happened after that?

A. Immediately after he rolled over, I heard a gunshot go off on my left side.

Q. Can you distinguish between the first gunshot and the second gunshot?

A. Yes. The first gunshot, like I said, was directed away. This one was directly in proximity to me on my left side.

Q. And was it at or in your direction?

A. Yes.

. . .

Q. . . . how are certain are you that the Defendant shot at you?

A. 100 percent.

Rep. R. vol. 3, 69-70, 74, 105-104.

Johnston testified that after hearing the second gunshot, he began to struggle with Appellant to gain possession of the gun he could see in Appellant's hands. At the same time, Johnston began reaching for his service weapon. When Johnston tugged on his weapon, Appellant released the firearm he had in his hands and Johnston seized it. Johnston stood, separated from Appellant, drew his weapon, and pointed it at Appellant with commands to get on the ground. Appellant told the officer not to shoot but refused to get on the ground. Johnston said he then went behind Appellant and kicked him in an attempt to force him to his knees, at which point Appellant fled again. Johnston began pursuing Appellant but had to stop out of exhaustion. Appellant successfully evaded police that morning.

The gun Johnston seized from Appellant was a Smith and Wesson double-action revolver. From inside the revolver's cylinder, Johnston collected two spent casings and four unspent casings. Johnston testified that the incident left him with a ringing in his left ear and a sprained left shoulder.

Johnston explained to the jury that when a Taser is fired, two probes are deployed, and both probes have to make contact with the target for the electrical current to connect. Johnston told jurors that he did not think that the Taser made complete contact with Appellant because he would

have been immobilized for five seconds and would not have been able to roll over immediately. No probes were discovered at the scene.

On cross-examination, Johnston confirmed that he did not see Appellant's gun until after the second gunshot when the two were struggling on the ground. The barrel of the weapon was facing away from Johnston as he grappled with Appellant to gain control of the revolver. Johnston confirmed that based on the way Appellant immediately fell upon being struck by the Taser, it was apparent the Taser had some effect on Appellant.

*Appellant's version*

Appellant, who lived in the area, testified he was on his way to sell the revolver to someone nearby when he saw Johnston's spotlights and decided to turn around and go back home. After his initial compliance, Appellant said he fled because he did not want Johnston to find the gun or for "something to go wrong." As he ran, Appellant pulled the gun from his waistband and was going to throw it over a fence, but the Taser struck him before he could get rid of it. As Appellant fell forward, the first gunshot went off. Appellant testified on direct examination that he did not hear or recall the second shot going off:

> Q. Now, are you having selective memory because the second shot -- the testimony was, well, the second shot was in his direction?
>
> A. No sir. It's just I know about the first shot, because when I -- when I was -- when I ran around that corner, I pulled it -- I pulled it out so I can throw it over -- there's a -- a fence on the side, and I was trying to throw it over.
>
> And that's when he hit me, and I locked up. And when I fell is when it -- the gun -- the gun went off when I -- he hit me, and then I fell forward, and that's when the shot went off. And after that, I mean, that was it, like -- I mean, he jumped on top of me.
>
> Because I was still facing down, he jumped on top of me, and I was still -- I still could feel the effect. Like I said, I could feel it in my lower part of my back, and then that was it, like -- I mean, the firearm wasn't in my possession.
>
> . . .
>
> Q. Did you intentionally pull the trigger to fire at Officer Johnston?

A. No, sir.

. . .

Q. While that scuffle was going on, were you still having any effects from the Taser?

A. From the initial tase when he tased me, that's when I fell. When I fell, as soon as I hit the ground, the weapon was no longer in my possession. It had already fell out. So when he's saying that he reached for my hands and pinned myself down, I mean, I -- I didn't -- I didn't have the weapon on me anymore.

Rep. R. vol. 3, 223-24.

Appellant disputed being kicked by Johnston before taking off running. Later that morning, Appellant found one of the Taser probes as he was undressing.[1] Although he initially thought he had been struck in the buttocks because of the pain he felt there, he realized when he took his shirt off that it had been situated in the center of his back. Appellant testified that when he found out about the seriousness of the charges being brought against him the next day, Appellant talked to his family and decided he would turn himself in knowing he was "innocent of" attempted capital murder.

On cross-examination, Appellant said his finger was on the trigger when he pulled the gun out of his waistband intending to throw it over the fence. When Appellant fell from the impact of the Taser, the gun discharged. Appellant testified that he was still on his stomach "locked up" from being tased and could not move when Johnston made contact with him after the first gunshot went off. Appellant said that he did not immediately roll over when he fell down as Johnston had said, but rather that Johnston "fell full force" on Appellant's back. Appellant said that he had a bruise on his back between his shoulder blades after being tased, which the State pointed out was

---

[1] One of Appellant's family members later gave police the probe, which was admitted into evidence at trial.

inconsistent with Appellant's estranged wife's testimony that she had seen an injury to his lower back.[2]

*Video evidence*

Jurors were shown video footage from Johnston's body camera. Because Johnston's body camera was dislodged during the struggle, the video is not very helpful. It depicts Johnston's initial encounter with and his pursuit of Appellant. In the video, the laser sights from Johnston's Taser can be seen on Appellant's upper back before Johnston deploys it. However, because Johnston was running when he fired the Taser, it is difficult to tell where on Appellant's back the Taser actually made contact. Within three seconds, Johnston is on Appellant and the video goes black as the camera falls off. It is not apparent from the video evidence whether Appellant was on his stomach or back when Johnston approached him, or whether the gun was in his possession or not.

The first gunshot can be heard as Appellant is tased, but prior to him hitting the ground. Officer Johnston testified that he could hear the second gunshot in the video go off just as he comes up on Appellant. However, because of the cacophony of both men yelling and the audio recording picking up sounds of the struggle, it is not clear from the recording exactly when the second shot was fired.

*Other relevant testimony*

The State called Hereford Police Lieutenant Landon Swan to testify about the use and impact of Tasers. Swan explained that if both probes deployed from a Taser make contact with a target, the person hit will lose control of his muscles and become immobilized for about five seconds. If only one probe hits the target, the person will feel pain in that area but would still be able to function. If a person is hit in the lower portion of their body below their torso, it is possible he would still be able to move their upper body and vice versa. On cross-examination, Swan

---

[2] On direct examination Appellant said he never looked at his back after being tased, so it is unclear how Appellant determined he had a bruise on his back.

confirmed that the purpose of a Taser is to incapacitate someone in a non-lethal way, and that if a Taser makes contact with the target it is typically expected he will fall and hit the ground.

Retired Hereford Police Detective Robin Ruland testified as to the particulars of Appellant's .38 Special revolver. As a double-action revolver, it could be fired in two ways: either a complete pull of the trigger, which would cause the hammer to cock back and the weapon to fire, or by manually cocking the hammer and pulling the trigger. Ruland estimated that firing the revolver using the double-action method would require a four to five-pound pull, while the single-action method would require much less effort.

## II. Law and Analysis

To secure a conviction of attempted capital murder against Appellant, the State was required to prove that Appellant, with the specific intent to cause death of Johnston, while knowing Johnston was a peace officer acting in the lawful discharge of an official duty, discharged his firearm at or in the direction of Johnston, which amounted to more than mere preparation that tended but failed to effect the commission of the offense. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(1), 15.01(a); *see also Flanagan v. State*, 675 S.W.2d 734, 741 (Tex. Crim. App. 1984) (op. on reh'g) (holding that "specific intent to kill is a necessary element of attempted murder"). The element "with specific intent to commit an offense" means that the actor must have the intent to bring about the desired result, which is death of an individual in an attempted capital murder case. *Id.* "[T]he specific intent to kill may be inferred from the use of a deadly weapon." *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). Appellant contends the State failed to prove beyond a reasonable doubt that he possessed the specific intent to kill Johnston, and thus the evidence is insufficient.

In reviewing the sufficiency of the evidence to prove specific intent we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of

fact could have found proof of specific intent beyond a reasonable doubt. *Godsey v. State*, 719 S.W.2d 578, 582 (Tex. Crim. App. 1986); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 582–83 (quoting *Jackson*, 443 U.S. at 319). While an appellate court is "not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt . . . we are to ask ourselves whether the trier of fact, acting rationally, could have found the evidence sufficient to establish the element beyond a reasonable doubt." *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1989) (op. on reh'g) (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010) (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

In this case, the evidence shows that two gunshots were fired from Appellant's double-action revolver. As I have previously explained:

> [A] double-action revolver requires much more force in order to pull the trigger than a typical, single-action semi-automatic pistol, and firing a double-action revolver therefore requires more deliberate action than a single-action semi-automatic pistol. With single-action semi-automatic pistols, the pistol's hammer is already cocked and a pull of the trigger performs a single action: it releases the hammer (hence the term "single- action"). After firing, the hammer is automatically recocked (hence the term "automatic"), and the gun is ready to fire again. In contrast, with double-action revolvers, the hammer is not already cocked, and a pull of the trigger performs two actions (hence, "double-action"). The trigger pull first cocks the hammer and then releases the hammer. Because the trigger pull must do two things, and the cocking of the hammer is also working against the hammer's spring, pulling the trigger on a double-action revolver requires considerably more force than a single-action semi-automatic pistol. As a result, it is almost impossible to accidentally or involuntarily fire a fully-functioning double-action revolver unless the hammer is in the cocked position.

*Piper v. State*, No. PD-0712-18, 2019 WL 4315756, at *6 (Tex. Crim. App. Sept. 11, 2019) (Walker, J., concurring) (not designated for publication). While it remains true that accidentally discharging a double-action revolver seldomly occurs unless the hammer is cocked, the factual scenario of Appellant's case provides a rare example of a how a double-action revolver could be accidentally fired without the hammer being in the cocked position.[3]

Appellant testified that his finger was on the trigger when he was tased and fell to the ground. Johnston testified that the first shot was not fired at him and went off in the direction both men were running. At trial, the State did not assert through evidence or argument that Appellant intentionally fired the first shot. Thus, the evidence leads to a conclusion that Appellant accidentally fired the revolver when he was tased and fell with his finger on the trigger. I believe it is very possible that Appellant's pulling the trigger was accidental due to the effect of being tased.

However, it is doubtful that the same can be said about the second gunshot, which the jury, through its verdict, found Appellant intentionally fired. Johnston testified that he heard the second gunshot "prior to the . . . wrestling match with" Appellant.[4] That means Appellant was already on the ground when the second gunshot was fired. For the second shot to be fired, Appellant would have had to manually cock the revolver and pull the trigger or use considerably more force to pull the trigger and fire using the double-action method. It is practically impossible that Appellant, while lying on the ground, accidentally cocked the hammer and pulled the trigger. I also believe it would be almost impossible for Appellant to accidentally pull the trigger the second time after the initial effect of the taser subsided while in double-action mode. *Id*. at *7. ("Because there was no evidence that the revolver was defective or that the hammer was cocked, the evidence that

---

[3] There is no evidence that the hammer was in the cocked position or that the revolver was defective, only that Appellant had his finger on the trigger when it fired.

[4] Rep. R. vol. 3, 116.

Appellant fired the revolver leads to the conclusion that he deliberately and voluntarily pulled the trigger."). Unlike the first shot, the evidence surrounding the second shot supports a finding that Appellant intentionally fired the second shot as Johnston came into contact with him.

Appellant's specific contention is that the evidence is insufficient to prove specific intent because Johnston's statements that Appellant shot at Johnston are "nothing more than . . . conjecture."[5] In making this argument, Appellant ignores evidence supporting Johnston's testimony that Appellant shot at him, including: Johnston's ability to distinguish the second gunshot in the audio from his body camera; evidence that two spent casings were recovered from the cylinder of Appellant's revolver; Johnston's testimony that the second gunshot was fired on his left side and left him with a ringing in his left ear; Johnston's testimony that Appellant was not fully affected by the Taser, which was corroborated by evidence that only one probe was found and Appellant's wife's testimony that she only saw one injury on his back the following day; and Johnston's testimony that Appellant had the revolver in his hands following the second gunshot.

As the sole factfinders, the jurors were the exclusive judges of the credibility of the witnesses. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). The jurors were free to believe Johnston's testimony that he was shot at and disbelieve Appellant's self-serving testimony which implied that there was no second gunshot. *See Bustamante v. State*, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003). As the reviewing Court, we must "defer" 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Zuniga*, 551 S.W.3d. at 732 (quoting *Jackson*, 443 U.S. at 319)). Applying these sufficiency standards, the evidence shows that Johnston's testimony that Appellant shot at him was not merely "conjecture" but rather was corroborated by other

---

[5] Appellant's Pet. for Discretionary Review at 9.

evidence, and the totality of the evidence was sufficient to support the jury's finding of specific intent.

### III.    Conclusion

In conclusion, I agree that Appellant's petition for discretionary review should be refused because the evidence is sufficient to prove the specific intent element of attempted capital murder. Although this case presents a unique factual scenario where a double-action revolver can in fact be accidentally discharged, it appears to me that only the first gunshot was fired accidentally. The issue would certainly be clearer had the State's witness on the revolver checked the pull weight on the trigger of the revolver instead of suggesting that it was about five pounds, and had the State's witness on Tasers explained to the jury whether it was possible to accidentally pull the trigger while being tased and whether one could turn over three seconds after being tased and shoot behind him. Nevertheless, based on the evidence and the "physical reality" of a double-action revolver,[6] I am confident that the evidence is sufficient to show that Appellant intentionally fired the second shot. Thus, I concur with the Court's decision to refuse Appellant's petition for discretionary review.

FILED: January 27, 2021
PUBLISH

---

[6] *See Piper*, 2019 WL 4315756, at *7 (Walker, J., concurring) (explaining that "the physical reality of [a double-action revolver] itself strongly militates against any claim that it was accidentally or involuntarily fired").