Bobby Gene BUTLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–94–00252–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 22, 1998.

Published in Part Pursuant
to Tex. R. App. P. 90.

Marcelyn Curry, Houston, for Appellant.

John B. Holmes, William Delmore, III, Houston, for Appellee.

Before MIRABAL, HEDGES and ANDELL, JJ.

## OPINION

HEDGES, Justice.

Appellant, Bobby Gene Butler, was convicted by a jury of capital murder. The State did not seek the death penalty. Appellant was sentenced to life imprisonment by the trial judge. *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon 1994). We affirm.

### Facts

During the early morning hours of July 13, 1993, Frederick Jones, a forklift operator, was driving home when he saw Jerry Godwin in front of his concrete plant on Chrisman Road waving for help.[1] Jones stopped, and Godwin said that he had been shot with a 12–gauge shotgun. He asked Jones to call 911. Godwin had blood on his face, his voice was faint, and he was weak. He declined Jones's offer to take him to a nearby fire station. Jones drove to a store, placed a 911 call, then directed paramedics and sheriff's officers to Godwin's location. In the 15 to 20 minutes that Jones was gone, Godwin died. Par-

---

1. Jerry Godwin owned and lived at the Quality Concrete plant on Chrisman Road.

amedics found his body in a sitting position on the floor of the Quality Concrete office with his back to the wall. The office had been ransacked, and the phone cords had been forcibly pulled from the wall. A four-way lug wrench with blood on it was found against a fence. (This wrench was later admitted into evidence as State's exhibit three. The blood was determined to be Godwin's blood type.) Although no shotgun was found, officers found three spent shotgun shells and identified two shotgun blast patterns in the concrete. While the officers were still investigating the crime scene, Danny Wilson, one of Godwin's former employees, arrived to inquire about Godwin. When Wilson told them that his wife, Cynthia Wilson, had been shot in the leg, deputies accompanied him home. Both Wilsons gave written statements to detectives. Cynthia Wilson was asked to return the following day for a polygraph examination.

The next morning, a detective received a phone call from a woman named Laverne, who said that she had seen Danny and Cynthia Wilson in a lounge trying to sell jewelry which Laverne believed to be Godwin's.[2] Confronted with this information, Cynthia Wilson stated that the person who had committed this crime was someone she knew as "Moon." Detectives determined from people in the neighborhood that appellant was called "Moon." Appellant was photographed but not taken into custody at that time.

On July 14, officers received information from a confidential source that led to the recovery from James Roberts of the shotgun Godwin had kept behind his office door. Roberts testified that he had purchased the shotgun from appellant that day for twenty dollars. He stated that the gun had a broken stock and bent barrel when appellant sold it to him.[3] Appellant had told him that he had broken it "on some old white guy's head." Godwin was a 60–year–old white man. This shotgun proved to be a murder

weapon and was admitted into evidence as State's exhibit two.

Cynthia Wilson identified appellant's photograph, and she and appellant were charged with capital murder on July 15, 1993. Appellant was arrested that same date, and gave a lengthy written statement that included his account of this offense. This statement was admitted into evidence. Appellant related that Cynthia Wilson drove him to the cement plant in her El Camino because she knew that "the old man" kept thousands of dollars in cash on him and had expensive jewelry.[4] Appellant said he threatened the man with a four-way tire tool, demanding his money and jewelry. Appellant admitted tying the man's hands with telephone cord. When he went outside where Wilson was attempting to start the man's truck, the man fired a shotgun at him from the doorway. Appellant stated that he immediately took the weapon away from the man and shot him "down toward his legs." Appellant further related that he sold the shotgun and jewelry to buy crack cocaine.

An autopsy of the body of Jerry Godwin revealed a blunt laceration to the top of the head and depressed skull fracture, causing significant brain hemorrhage. Sixteen ribs were fractured, 10 on the left side and six on the right. The sternum was also fractured. There was a shotgun wound of entrance to the left and right thighs near the buttocks. This wound lacerated an artery and vein. A three-quarter-inch plastic wad from a shotgun shell was recovered from the right thigh. Several pellets consistent with number nine bird shot were also recovered along the wound track.

Godwin's skull fracture was consistent with having been caused by either the four-way tire tool found at the scene and admitted as State's exhibit three, or the shotgun admitted as State's exhibit two. His death was caused by either the shotgun wound to the thighs or the skull fracture.

---

2. Godwin had two diamond rings and an expensive watch.

3. According to David Robinson, one of Godwin's employees, there was nothing wrong with the shotgun when he left work at 5:00 p.m. on July 12, 1993.

4. It was Godwin's habit to keep a large amount of cash for the payroll, and Cynthia Wilson had borrowed money from Godwin when her husband worked for Quality Concrete.

At trial, appellant testified that he and Cynthia Wilson were smoking crack cocaine on the day of this offense and that she drove them to the cement plant in her El Camino. According to appellant's testimony, he hid while Wilson went inside the office. The plan was for Wilson to occupy Godwin while appellant broke into the office and stole money and jewelry. When appellant tried the office door after Godwin and Wilson went somewhere in "the very back," he found that the door was locked. Godwin returned to the office and appellant "fell on top of him." Appellant admitted taking Godwin's money, making him get on his knees in the office, pulling the phone cords from the wall, tying Godwin's hands behind his back, taking his wallet, and struggling with him over the shotgun after Godwin freed himself. According to appellant, "the gun went off." [5] Appellant denied striking Godwin with the shotgun or tire tool. He further testified that he left on foot with the money in a pillowcase. He sold the jewelry and spent all the money on crack cocaine. He sold the shotgun, which he testified was not bent or broken at the time, to James Roberts for two rocks of cocaine.

Bonnie Durdin testified for the defense that she had heard Cynthia Wilson ask appellant, herself, and many other people to rob a place of business and kill the owner. Tony Smith, appellant's first cousin, testified that he was with appellant when the shotgun was sold to James Roberts and that the gun was not bent or broken then.

### Legal Sufficiency of the Evidence

In point of error two, appellant challenges the legal sufficiency of the evidence to prove that he intentionally caused Godwin's death.

When conducting a legal sufficiency review of the evidence, we view the evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.

Crim.App.1997). The issue is whether any rational trier of fact could find the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *McDuff*, 939 S.W.2d at 614; *Green v. State*, 891 S.W.2d 289, 297 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). If there is evidence that establishes guilt beyond a reasonable doubt, and if the fact finder believes the evidence, we will not reverse the judgment for insufficient evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988); *Reece v. State*, 878 S.W.2d 320, 325 (Tex.App.—Houston [1st Dist.] 1994, no pet.). We apply the same standard of review where the evidence is circumstantial. *See Geesa v. State*, 820 S.W.2d 154, 158 (Tex.Crim.App. 1991); *Williams v. State*, 902 S.W.2d 505, 507 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd).

The indictment alleged in three paragraphs that, while in the course of committing a robbery, appellant intentionally caused Godwin's death by shooting Godwin with a firearm, by striking Godwin with a tire tool, or by striking Godwin with a shotgun. The shotgun and the tire tool were alleged to be deadly weapons. The jury charge authorized appellant's conviction of capital murder under any of these three theories.[6] The jury returned a general verdict finding appellant guilty of capital murder.

When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld. *McDuff*, 939 S.W.2d at 614. Thus the State need only have sufficiently proved one of the paragraph allegations to support the verdict of guilt. We must determine whether there was sufficient evidence to support the finding of guilt based on any of the allegations submitted to the jury.

Appellant asserts that there was no evidence of his intent to kill. In support, he points to testimony that (1) Godwin was alive

---

5. Appellant also stated during cross-examination that as he and Godwin struggled for possession of the shotgun, Godwin shot himself.

6. The charge also authorized appellant's conviction under the law of parties if it found that he

acted with intent to promote or assist the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid Cynthia Wilson in the commission of capital murder by any of the three alleged means.

when appellant left him; (2) Godwin was shot in the upper thighs, rather than "in a more vital part of the body," and (3) according to Tony Smith, the shotgun was not broken and bent when it was sold to James Roberts.

■ Conflicts in evidence are for the jury to resolve, as judge of the facts. *Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim.App. 1986); *see* TEX.CODE CRIM. P. ANN. art. 38.04 (Vernon 1979). When confronted with evidence which raises conflicting inferences regarding a defendant's culpable mental state, a reviewing court must presume that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex.Crim.App.1991).

■ We find that any rational trier of fact could have found beyond a reasonable doubt that appellant, while in the course of committing the robbery of Godwin, intentionally caused Godwin's death by shooting him with a firearm. The specific intent to kill may be inferred from the use of a deadly weapon, unless from the manner of its use it is reasonably apparent that death or serious bodily injury could not result. *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex.Crim.App. 1986); *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex.Crim.App.1984) (op. on reh'g); *Ly v. State*, 943 S.W.2d 218, 220 (Tex.App.— Houston [1st Dist.] 1997, pet. ref'd). A shotgun is a deadly weapon per se. *Flanagan*, 675 S.W.2d at 744. If a deadly weapon is used in a deadly manner, the inference of intent to kill is almost conclusive; on the other hand, if the weapon was not used in a deadly manner, the evidence must be established by other facts. *Godsey*, 719 S.W.2d at 581.

In his written confession, appellant admitted that he wrested the weapon from Godwin and shot him "toward his legs," as Godwin walked toward his truck. The medical examiner testified that the shot was probably fired from a distance of more than 24 inches because of the lack of powder stippling or soot. However, the blast was close enough that, though Godwin was wearing jeans, the first officer to arrive saw tissue hanging down on the back of Godwin's left leg. The shot was to the top of Godwin's thighs; in fact, Godwin

told Frederick Jones that he had been "shot in the rear." The medical examiner testified that the shotgun wound in and of itself would have caused Godwin's death. We find that this evidence constitutes the use of a deadly weapon in a deadly manner and was sufficient to prove that appellant intentionally caused Godwin's death by shooting him with a firearm.

■ We also find that any rational trier of fact could have found beyond a reasonable doubt that appellant, while in the course of committing the robbery of Godwin, intentionally caused Godwin's death by striking him with a deadly weapon, namely, a shotgun. There was nothing wrong with the shotgun at 5:00 p.m. on July 12, eight hours before Godwin was killed. The day after the murder, appellant sold the shotgun to James Roberts. According to Roberts, when he bought the gun, the stock was broken and the barrel was bent, and appellant explained that he had "broken it on some old white guy's head." The medical examiner testified that Godwin had a blunt laceration to his head with a depressed skull fracture and brain hemorrhage. This injury was fatal, sufficient in itself to have caused death. He further testified that the shotgun was consistent with having caused this injury. This evidence was sufficient to establish appellant's intent to kill Godwin by striking him with the shotgun.

■ We further find that any rational trier of fact could have found beyond a reasonable doubt that appellant, while in the course of committing the robbery of Godwin, intentionally caused Godwin's death by striking him with a deadly weapon, namely, a tire tool. Appellant admitted in his written confession that he "jumped out from behind the post right there at the office with a four-way tire tool" which he "held up and told [Godwin] to give [him] the money." The confession then relates that Godwin "fell back" for no stated reason. A four-way tire tool was found by investigating officers against a fence. There was blood matching Godwin's blood type on a lug of the tire tool. The medical examiner testified that the fatal skull fracture to Godwin's head could have been

caused by the tire tool. This circumstantial evidence was sufficient to establish appellant's intent to kill Godwin by striking him with the tire tool.

We overrule point of error two.

### Factual Sufficiency of the Evidence

■ In point of error three, appellant contests the factual sufficiency of the evidence to prove that he intentionally caused Godwin's death. Since appellant's brief was filed in this Court, the Court of Criminal Appeals issued its opinion in *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997), further explaining its opinion in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996). To conduct a factual sufficiency review, we do not view the evidence through the prism of "in the light most favorable to the prosecution." *Cain*, 958 S.W.2d at 407; *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); *Peoples v. State*, 928 S.W.2d 112, 118 (Tex.App.—Houston [1st Dist.] 1996, pet. ref'd). Instead, we examine all of the evidence impartially and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 958 S.W.2d at 410; *Clewis v. State*, 922 S.W.2d at 129; *Peoples v. State*, 928 S.W.2d at 118. In deference to jury findings, we may find the evidence factually insufficient only where necessary to prevent manifest injustice. *Cain*, 958 S.W.2d at 407.

■ As support for his argument that the evidence was factually insufficient to establish his intent to kill Godwin by shooting him with a firearm, appellant points to his trial testimony that the shooting was accidental. However, his written confession stated that he intentionally shot Godwin. In resolution of these contradictory statements, we must defer to the jury's finding. *Cain*, 958 S.W.2d at 407.

As support for his argument that the evidence was factually insufficient to establish his intent to kill Godwin by striking him with the shotgun, appellant argues that James Roberts was not a credible witness. Roberts testified that appellant sold him the shotgun the day after the killing and that it had a broken stock and bent barrel at that time. Appellant points out that Roberts had two convictions for robbery, one for aggravated robbery, and one for possession of cocaine. Appellant contrasts Roberts's testimony with that of Tony Smith, appellant's cousin, who testified for the defense that the shotgun was undamaged when he and appellant took it to Roberts. Credibility determinations are for the jury. *Cain*, 958 S.W.2d at 407, n. 5.

As support for his argument that the evidence was factually insufficient to establish his intent to kill Godwin by striking him with the tire tool, appellant argues that there was no evidence that he struck Godwin with the tire tool. This argument is refuted by the following evidence: appellant admitted in his written confession that he held the tire tool and threatened Godwin with it during the robbery; blood consistent with Godwin's type was on the tire tool; and Godwin's fatal head injury was consistent with having been caused by the tire tool. The fact that there was "blood everywhere," as appellant argues, does not render the evidence factually insufficient. The blood was on the actual lug of the tire tool which was found in grass against a fence.

We hold that the evidence was factually sufficient to support a finding that appellant intentionally caused Godwin's death under any of the three means alleged in the indictment and submitted in the court's charge.

We overrule point of error three.

### Codefendant's Invocation of Right Not to Testify

■ In points of error four and five, appellant complains that his constitutional right to compulsory process was denied by Cynthia Wilson's plea bargain agreement that "forced the codefendant not to testify" and that the trial judge erred in overruling appellant's objection to Wilson's invocation of her right against self-incrimination because she had already pled guilty and was not subject to further prosecution.

Together with appellant, Cynthia Wilson was charged with the capital murder of Jerry Godwin. She gave a written statement to sheriff's detectives on July 14, 1993. On

March 2, 1994, the second day of appellant's trial, Wilson entered a plea of guilty to the reduced charge of murder and judicially confessed that she had committed the crime with appellant. The punishment terms of Wilson's plea agreement were:

> Life in [prison], unless defendant testifies truthfully at the trial of codefendant Bobby Gene Butler or is not called to testify, then defendant receives 45 years [in prison]. Affirmative finding of a deadly weapon on both scenarios.

Wilson was called to the witness stand by the defense out of the jury's presence on March 8. After consulting with her attorney, Wilson invoked her Fifth Amendment right not to testify. The record does not reflect the sentence Wilson received.

The Court of Criminal Appeals recently issued an opinion pertinent to these points of error. In *Coleman v. State*, 966 S.W.2d 525 (Tex.Crim.App.1998), the defendant subpoenaed newspaper reporters who filed motions to quash on the basis of a claimed First Amendment privilege. At the conclusion of a hearing, the motions to quash were granted. The defendant argued on appeal that his Sixth Amendment right to compulsory process was violated. The Court of Criminal Appeals stated:

> The Sixth Amendment right to compulsory process "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Sixth Amendment does not guarantee, however, the right to secure the attendance and testimony of any and all witnesses; rather, *it guarantees only compulsory process for obtaining witnesses whose testimony would be both material and favorable to the defense. United States v. Valenzuela–Bernal*, 458 U.S. 858, 866–67, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). *To exercise the federal constitutional compulsory process right, the defendant must make a plausible showing to the trial court, by sworn evidence or agreed facts, that the witness' testimony would be both material and favorable to the defense. Ex parte Scarbrough*, 604 S.W.2d 170, 173–174 (Tex.Crim.App.1980); *Perez v. State*, 590 S.W.2d 474, 479 (Tex.Crim.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2157, 64 L.Ed.2d 790 (1980); *Spencer v. State*, 503 S.W.2d 557, 560–561 (Tex.Crim.App.1974); *Jones v. State*, 501 S.W.2d 677, 679 (Tex. Crim.App.1973); *Hardin v. State*, 471 S.W.2d 60, 63–63 (Tex.Crim.App.1971); accord, *United States v. Mejia–Uribe*, 75 F.3d 395, 399–400 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 97 (1996); 22A C.J.S. *Criminal Law* § 473 (1989).

*Coleman*, 966 S.W.2d at 527–28 (emphasis added). The court went on to hold that the defendant "did not make the necessary showing" because

> he made no plausible showing to the court that the reporters' testimony would actually be *material* and *favorable* to either of his defensive theories. Absent such a showing, the Sixth Amendment did not require the District Court to compel the reporters to testify.

*Id.* at 528 (emphasis in original).

The only proffered evidence as to what Wilson's testimony would have been consisted of the two written statements she gave to police.[7] In the first statement, Wilson said that she witnessed the beating and shooting of the victim by an unknown man. In her second statement, she identified the assailant as someone she knew as "Moon." A detective testified that Wilson positively identified appellant's photograph, which police obtained based on the "Moon" street name, as the man who committed the offense. There is nothing in either statement that is exculpatory to appellant. Appellant made no showing in the trial court by sworn evidence or agreed facts that Wilson's testimony would have been favorable to the defense. Appellant's counsel argued only that Wilson was not entitled to claim a Fifth Amendment

---

7. These statements were not before the jury, but were included in the appellate record as part of the hearing before the judge.

privilege because of her guilty plea and that he wanted to question her "about circumstances surrounding this offense" as opposed to any extraneous offenses.

We follow *Coleman,* 966 S.W.2d at 528, and hold that because appellant made no plausible showing to the trial court that Wilson's testimony would actually be material and favorable to his defense, the Sixth Amendment did not require the trial judge to compel her to testify.

We overrule points of error four and five.

### Denial of Requested Jury Instruction on Voluntary Conduct

■ In point of error seven, appellant argues that the trial judge erred in denying his requested jury instruction on the voluntariness of his conduct. Appellant testified that Godwin fired the shotgun first, that appellant grabbed the barrel of the shotgun, and that while they struggled for possession of it, the shotgun "went off," striking Godwin in the legs.[8] Appellant requested the following jury instruction:

A person commits an offense only if he voluntarily engages in conduct, including an act, an omission or possession. *See* TPC Section 6.01.

Therefore, if you believe from the evidence beyond a reasonable doubt that on the occasion in question, Bobby Gene Butler, did cause the death of Jerry Godwin by shooting him with a gun, as alleged in the indictment, but you further believe from the evidence, or you have a reasonable doubt thereof, that the shooting was a result of an accidental discharge of the gun while Jerry Godwin and the defendant were struggling for the possession of the gun and not the voluntary act or conduct,

you will acquit the defendant of capital murder.

This request was denied by the trial judge.[9]

In *Brown v. State,* 955 S.W.2d 276, 280 (Tex.Crim.App.1997), the court held that if the evidence raises the issue of the conduct of the actor not being voluntary, then the jury shall be charged, when requested, on the issue of voluntariness. If appellant had been charged with causing Godwin's death by shooting him with a firearm only, *Brown* would be dispositive. However, unlike *Brown,* in this case multiple theories of culpability were submitted to the jury, and the requested instruction applied to only one of them.

■ The voluntariness charge should have been given as to the theory that the victim was shot with a firearm. However, in light of the other two alternative paragraphs, the error was harmless. There was evidence of two independent causes of death, and, as we have held, sufficient evidence was presented to support the jury's general verdict under all three of the theories contained in the indictment. We therefore assess the likelihood, in light of the entire record, that the jury's verdict was actually based upon an alternative available theory of culpability not affected by the error. *See Atkinson v. State,* 923 S.W.2d 21, 27 (Tex.Crim.App.1996).

An examination of the record reveals that the State relied most heavily upon the allegations that the victim was *struck* with a tire tool or *struck* with a shotgun, fracturing his skull, not upon the theory that the victim was shot with a firearm. The prosecutor mentioned the shooting only once during closing argument but forcefully argued for conviction based on the skull fracture. For example, the prosecutor stated:

When he testified here he said, I never picked up that tire tool. In his statement—he backs off even further today—

---

**8.** These facts are similar to those in *Garcia v. State,* 605 S.W.2d 565, 566 (Tex.Crim.App.1980), where the conviction was reversed and remanded for failure to give a requested jury instruction on voluntariness.

**9.** While this requested instruction was incorrect in that it would have required the jury to acquit appellant if they found he acted involuntarily as

to only one of the alleged means of committing the offense, we find that it was sufficient to call the trial court's attention to the claimed omission in the charge. *See Chapman v. State,* 921 S.W.2d 694, 695 (Tex.Crim.App.1996); *Bohnet v. State,* 938 S.W.2d 532, 534 n. 1 (Tex.App.—Austin 1997, pet. ref'd).

but in the statement he said, I came around, the tire tool raised over my head and the old man fell back and hurt his arm. Why is that important he said that? Because he knew that the old man had been hurt and hurt bad. And when you look at the pictures you want to, you look at the victim's arm. The victim has a cut mark out of his arm that is exactly the same as the cut mark on his head which means when he was getting beat, whether it was the tire tool or the shotgun, he was just like this and that was coming down on his arm. His arm went down on his head and everything went down, the defendant had beaten beyond anything imaginable.

The prosecutor also reminded the jury during argument that there was blood on the shotgun, blood on the tire tool, that the shotgun was bent when appellant sold it, and that appellant admitted hitting a white man in the head with the shotgun.

In his argument, the prosecutor made only a single reference to the shooting of the victim. The comment also alluded to the voluntariness of appellant's conduct.[10] The argument was as follows:

Then we struggled over the gun and the defendant [sic] accidentally turned around and turned the gun around and shot himself from behind. That is his story. The reason that is his story today is because he realized in his original statement that when he said, even then he said, I didn't mean to kill him, I shot down, that that still is incriminating to him.

Thus, there were only these three sentences referring to the shooting in the State's 14–page argument.

The trial judge's denial of the instruction on the voluntariness of appellant's conduct that applied to only one means of committing the offense is analogous to cases in which the jury was erroneously instructed concerning the law of parties. In those cases, the question of harm turned on whether the evidence clearly supported defendant's guilt as a primary actor and whether that was the theory upon which the State relied. *See Govan v. State*, 682 S.W.2d 567, 570–71 (Tex.Crim.App. 1985); *Brown v. State*, 716 S.W.2d 939, 945–46 (Tex.Crim.App.1986); *Black v. State*, 723 S.W.2d 674, 675–76 (Tex.Crim.App.1986); *Johnson v. State*, 739 S.W.2d 299, 305 (Tex. Crim.App.1987); *Scott v. State*, 768 S.W.2d 308, 309–10 (Tex.Crim.App.1989).

Another situation analogous to appellant's case was presented in *Atkinson*, 923 S.W.2d at 27, a case in which a jury instruction was improperly denied where two theories of culpability were submitted to the jury in a driving while intoxicated case. The court remanded the case to the court of appeals for a harm analysis and held:

Our precedents under article 36.19,[11] as authoritatively construed in *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1985) (opinion on rehearing), make it clear that, unlike errors subject to review under rule 81(b)(2),[12] the harmfulness of error in a jury charge should be measured, at least in part, against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.

*Id.*[13]

Accordingly, in light of the entire record, we find that no harm resulted to appellant from the denial of the requested instruction because (1) the evidence clearly supported his guilt under alternate theories unaffected by the erroneous portion of the charge, (2) the State relied most heavily on the alternate theories, and (3) it is very likely that the

---

**10.** The prosecutor made one other brief reference to the voluntariness of appellant's conduct, but it referred to the beating, not the shooting. He said, "Look at the pictures and look at the autopsy pictures so you get to see the beating this man took. They're saying it is an accident." Appellant did not request a voluntariness charge as to the beating.

**11.** Tex.Code Crim. P. Ann. art. 36.19 (Vernon 1981).

**12.** Tex.R.App. P. 81(b)(2) (Vernon 1997).

**13.** On remand, the court of appeals found that *Govan* and its progeny did not control because both theories of culpability were affected by the trial court's refusal to give the requested instruction. *Atkinson v. State*, 934 S.W.2d 896, 898 (Tex.App.—Fort Worth 1996, no pet.).

jury's verdict was based on an alternate theory.

We overrule point of error seven.

The discussion of the remaining points of error does not meet the criteria for publication, TEX.R.APP. P. 47.4, and is thus ordered not published.

We affirm the judgment of the trial court.

ANDELL, J., dissents.

ANDELL, Justice, dissenting.

I agree with the majority that the trial court's denial of appellant's request to instruct the jury concerning the voluntariness of his conduct was error. I respectfully dissent, however, to the majority's holding that the error was harmless.

An *Almanza*[1] harm analysis was not conducted by the court in *Brown v. State*, 955 S.W.2d 276, 278–80 (Tex.Crim.App.1997), nor did the court remand the cause to the court of appeals for such an analysis.[2] The Court of Criminal Appeals held:

> We hold that if the admitted evidence raises the issue of the conduct of the actor not being voluntary, then the jury shall be charged, when requested, on the issue of voluntariness. The trial court did not grant appellant's request and the court of appeals correctly reversed the trial court.

*Id.* at 280.

We are bound to follow the precedent of the Court of Criminal Appeals. I would therefore follow *Brown* and reverse the conviction and remand this cause for failure of the trial court to instruct the jury concerning the voluntariness of appellant's conduct in shooting the decedent with a firearm.

I respectfully dissent.

---

**1.** *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1985) (op. on reh'g).

**2.** The court of appeals did not conduct a harm analysis of this error. *See Brown v. State*, 906 S.W.2d 565, 567–68 (Tex.App.—Houston [14th Dist.] 1995), *aff'd*, 955 S.W.2d 276 (Tex.Crim.

App.1997). Further, neither the concurring justice in the court of appeals, nor the four dissenting justices in the Court of Criminal Appeals, called for a harm analysis. *Brown*, 906 S.W.2d at 568–69; *Brown*, 955 S.W.2d at 281–85.