Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



MARK E. ROBBINS,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-02-00519-CR

Appeal from the

243rd District Court

of El Paso County, Texas

(TC#20020D04717)




O P I N I O N
           A jury convicted Mark Robbins of seven counts of attempted capital murder and
two counts of aggravated assault on a public servant. The jury sentenced him to twenty
years’ imprisonment for attempted capital murder and fifteen years’ imprisonment for
aggravated assault on a public servant. On appeal, Robbins argues that the evidence was
legally insufficient and that the prosecutor made an improper jury argument. Finding no
merit to these contentions, we affirm.
Factual Background
           Two El Paso Police Department Officers were dispatched to Robbins’s house
based on a report of an altercation between Robbins and his wife. The officers were
informed that Robbins had worked for the El Paso County Sheriff’s Office, that he may
have weapons in the house, and that he might be suicidal. When the officers arrived, they
asked the dispatcher to call the house. The dispatcher called several times without getting
an answer. One of the officers knocked on the door and got no response. They noticed
that the house had some broken windows. They also saw Robbins’s mother down the
street. She was “hysterical” and had heard shots coming from Robbins’s house. One of
the officers testified that he spoke over the phone with Robbins’s wife, who told him that
Robbins had shot at her using a bow and arrow and that she had left the house.


 One of
the officers also spoke on the phone with Robbins. Robbins told the officer that he did
not intend to come out of the house because he believed he would be arrested for
aggravated assault or placed in protective custody for mental problems.
           The officers’ supervisor arrived and spoke with Robbins over the phone. Robbins
told him that “things” were “going to get ugly.” A decision was made to call out the
Special Weapons and Tactics Unit (SWAT). Eventually, as many as sixty officers
arrived, and a standoff ensued until Robbins finally surrendered six-to-eight hours after
SWAT arrived. As discussed in detail below, the State presented evidence that Robbins
shot at several of the officers during the course of the standoff.
 

Sufficiency of the Evidence
           The jury convicted Robbins of the attempted capital murder of Officers Steve
Moreland, Adrian Ruiz, John Cataldi, Bernandino Martinez, Sergio Lopez, Ken Law, and
Steven Smith, and of the aggravated assault of Officers Jose Reveles and Carlos
Contreras. In his first issue, Robbins argues that the evidence is legally insufficient to
establish that he intended to kill or harm any of these officers.
Standard of Review
           In reviewing the legal sufficiency of the evidence, we must consider all the
evidence in the light most favorable to the verdict to determine whether a rational jury
could have found the essential elements of the offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
Wallace v. State, 52 S.W.3d 231, 234 (Tex. App.--El Paso 2001, no pet.). The jury, not
the reviewing court, has the power to weigh the evidence and to resolve conflicts in the
evidence. Wallace, 52 S.W.3d at 234. In reviewing the legal sufficiency of the evidence
to prove intent, we must presume that the jury resolved conflicting inferences from the
evidence in favor of the verdict, and we must defer to that resolution. Hullaby v. State,
911 S.W.2d 921, 929 (Tex. App.--Fort Worth 1995, pet. ref’d).
The Attempted Capital Murder Counts
           To establish that a defendant is guilty of attempted capital murder, the State must
prove that the defendant had the specific intent to kill. See Tex. Pen. Code Ann. §§
15.01(a), 19.02(b)(1) (Vernon 2003), § 19.03(a)(1) (Vernon Supp. 2004); Flanagan v.
State, 675 S.W.2d 734, 741 (Tex. Crim. App. 1984) (op. on reh’g); Tubbs v. State, 57
S.W.3d 519, 522-23 (Tex. App.--Waco 2001, pet. ref’d). Whether the defendant had the
intent to kill is a question of fact for the jury to determine. Brown v. State, 122 S.W.3d
794, 800 (Tex. Crim. App. 2003), cert. denied, 124 S.Ct. 1678, 158 L.Ed.2d 359 (2004);
Hall v. State, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967). In determining whether the
State has proven the intent to kill, the jury may use its collective common sense and may
apply common knowledge and experience. See Rodriguez v. State, 90 S.W.3d 340, 355
(Tex. App.--El Paso 2001, pet. ref’d). The jury may infer the intent to kill from any
evidence that it believes proves the existence of that intent. Brown, 122 S.W.3d at 800. 
For example, the jury may infer the intent to kill from the defendant’s words or conduct. 
Hall, 418 S.W.2d at 812; see also Wallace, 52 S.W.3d at 234. The jury may also infer the
intent to kill from the defendant’s use of a deadly weapon, such as a gun, unless it would
be unreasonable to infer that death or serious bodily injury could result from the use of
the weapon. Brown, 122 S.W.3d at 800; Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996); see also Tex. Pen. Code Ann. § 1.07(a)(17)(A) (Vernon Supp. 2004).
           With these principles in mind, we turn to the record to determine whether the
evidence is legally sufficient to establish that Robbins had the specific intent to kill the
officers.
 

Officer Moreland
           Officer Moreland arrived on the scene after the first officers had arrived but before
SWAT arrived. He climbed on the roof of a house near Robbins’s house. While on the
roof, he heard a loud pop, which he identified from experience as a shot from a high-powered rifle. Other officers had already informed Moreland that Robbins had high-powered weapons. He also heard the sound and felt the breeze from a bullet “whizzing”
by him at a distance of no more than five feet. He called out over the police radio that
shots were fired in his direction. Moreland testified that he was the only person in the
area and that he believed the shot was aimed at him. He was only seventy-five to eighty
yards from Robbins’s house. According to Moreland, it is “not very hard” to shoot
someone from that distance. Moreland acknowledged that it was dark when the shot was
fired and that it would have been hard to see his head from Robbins’s house.
Officer Ruiz
           SWAT Officer Ruiz was stationed on the roof of a shed in Robbins’s backyard. 
Robbins walked out of the house into the yard and saw Ruiz and another officer. He went
back into the house and turned on floodlights in the backyard. A SWAT negotiator,
Officer Valencia, testified that at one point during the standoff, Robbins said that he was
focusing his sights on an officer who was on the shed by a tree. After passing this
information along, Valencia heard over the radio that a shot had been fired. Several
officers, including Ruiz, testified that they heard over the police radio that Robbins had
told the negotiator that he saw someone in the trees behind his house and that he was
going to shoot him. Less than a minute later, a shot was fired. Officer Martinez testified
that he heard yelling coming from inside the house and saw a muzzle flash coming from
the back of the house.



           Ruiz testified that the muzzle flash was pointed at him. He also testified that the
bullet could have passed within a foot of him and was at most ten feet from him. Ruiz
stated that he had no doubt that Robbins was shooting at him. He acknowledged,
however, that he only called out over the police radio that he saw a muzzle flash in his
direction; he did not say that Robbins shot at him.
Officer Cataldi
           Officer Cataldi served as the primary negotiator on the public address (PA) team
during the incident. The PA team was located behind the trunk of a patrol vehicle pointed
towards Robbins’s house. The lights of the vehicle were on so that Robbins could not see
the PA team. Valencia, who was negotiating with Robbins over the phone, testified that
Robbins asked him who “John” was. When Valencia told him that John Cataldi was
another negotiator, Robbins told Valencia to tell the PA team to “shut up” or he was
going to start shooting. Several officers testified that they heard Robbins shout something
like “John, where are you?” He then stuck his hand out of one of the windows in his
house and pointed a gun in the direction of the PA team, including Cataldi. Robbins held
the gun in a level position and pointed it straight ahead, not up or down. Seconds later,
there was a muzzle flash at the window where Robbins had been standing, and the PA
team announced over the radio that a shot had been fired in the team’s direction. 
Martinez had “no doubt” that the gun was leveled directly at the PA team. Cataldi’s loud
speaker was directly behind the lights of the patrol vehicle, and Robbins shot in the
direction of Cataldi’s voice.
           Cataldi testified that he heard over the radio that Robbins was taking aim at the PA
team. He then heard a very loud gunshot. Cataldi did not know how close the bullet
came to him.
Officers Martinez, Lopez, Law, and Smith
           Officer Reveles, a SWAT sergeant, led a group of officers that approached
Robbins’s house using an armored rescue vehicle (ARV). Officer Lopez drove the ARV,
and Officer Martinez was stationed at a turret on the top of the ARV. Officers Smith,
Contreras, and Law were stationed behind the ARV once it stopped near Robbins’s
driveway. At that point, the ARV was about fifty feet from the front of Robbins’s house. 
 The ARV had a police badge painted on it, along with the words “police” and “rescue.” 
The vests the officers were wearing had a police emblem on the front and back.
           In an early conversation with Officer Valencia, the telephone negotiator, Robbins
asked Valencia if he had ever seen what armor-piercing bullets can do to a vest. In a later
conversation, Robbins said that he had C-4 explosives, gunpowder, and a gas mask, and
that if officers entered his house he was going to take as many of them as he could out
with him.
           Robbins came out of his house during the standoff and, according to the officers,
appeared to be trying to determine the locations of the officers. At one point while he
was outside of the house, Robbins yelled in the direction of the officers at the ARV,
inviting them to play “quick draw” and demanding that they get out of his driveway. He
immediately went inside the house and began firing in the direction of the ARV. 
Although the lights from the patrol vehicle would have blinded Robbins when he looked
towards his front yard, Martinez testified that the lights would not have had much effect
on Robbins’s ability to see the ARV. Smith testified that he saw Robbins level his gun
towards the ARV. Reveles indicated that all the officers deployed at the ARV were in the
line of fire.
           Reveles also testified that one of the shots hit the ARV just inches below the turret
where Martinez was and that if the shot had been just a few inches higher, it could have
hit Martinez on the vulnerable part of his bullet-proof vest. Martinez testified that he saw
a “perfect circle muzzle flash” coming towards him, and that the shot came within two
feet of hitting him. He also testified that there was no doubt in his mind that Robbins was
trying to kill him.
           Lopez, the driver of the ARV, testified that based on the muzzle flashes that he
saw and the fact that shots hit the ARV, he believed that Robbins was trying to kill the
officers in and around the ARV. Reveles testified that the armor on the ARV is “pretty
effective,” but that “[w]e have learned recently that . . . some rifle rounds, especially
armor-piercing ammunition will penetrate that armor.” He also stated that the glass on
the ARV “will take a certain amount of hits, but after a while, if it takes too many hits,
then it will be compromised and rounds can penetrate it.” Lopez also testified that bullets
could penetrate the ARV. When defense counsel asked him whether he was “trying to
leave the impression with the . . . jury that you’re concerned about bullets coming through
the ARV,” Lopez answered, “Yes, sir, I am.” He admitted, however, that he was not
aware of any incident in which bullets had penetrated the ARV. He explained, “I don’t
know how long we’ve had the armored vehicle, whether rounds have been put through it
or not. That’s a 1977 armored vehicle given to us by the Army. I don’t know what
they’ve done to it. I don’t know the history of that vehicle.”
           Law, who was behind the ARV, testified that when the shots were fired, his head
and the left side of his body were exposed. He estimated that the shots came within a foot
and a half of his body. He felt the “whiz” of a bullet going over his head and he heard
another bullet hit the ARV.
           Law testified that there was no doubt in his mind that Robbins was trying to kill
him. But he admitted that in his written statement he did not say that Robbins shot at
him; he only said that shots were fired in his direction. Smith, who was also behind the
ARV, testified that he was exposed from his chin to his forehead and that he felt one of
the bullets hit the ARV approximately four feet in front of him.
Analysis
           From the evidence just recited, the jury could have rationally determined, beyond a
reasonable doubt, that Robbins had the specific intent to kill the officers. He shot a gun
in the direction of each of the officers. Each of the officers except Cataldi was able to
testify that a bullet came close to him. Some officers also testified that they saw Robbins
aim in the direction of particular officers. Moreover, the jury could have inferred that
Robbins had the intent to kill from his conduct and words. The jury could have accepted
the officers’ testimony that Robbins was attempting to determine their positions when he
came out of his house and looked around. Robbins’s insinuations regarding things getting
ugly, armor-piercing bullets, and taking officers out with him could be viewed as threats
to kill some or all of the officers involved in the standoff. For all of the officers except
Moreland, the jury could also have inferred from Robbins’s words immediately before
shooting that he intended to kill. Before shooting at Ruiz, he said that he was focusing
his sights on Ruiz. Before shooting at Cataldi, he said that if the PA team did not shut up
he was going to start shooting. He also attempted to get Cataldi to state where he was. 
Before shooting at the officers stationed at the ARV, he challenged them to a game of
quick draw and demanded that they get out of his driveway.
           Robbins argues on appeal that he was more interested in harming himself than he
was in harming the officers. Indeed, the record does contain evidence from which the
jury could have inferred that Robbins was attempting to commit “suicide by cop.”


 But
the jury was not required to draw this inference, and we must view the evidence and the
inferences therefrom in the light most favorable to the jury’s verdict.


 Having done this,
we conclude that a rational jury could have found beyond a reasonable doubt that Robbins
intended to kill the officers.
           Robbins relies on King v. State, 166 Tex. Crim. 230, 312 S.W.2d 677 (1958), in
which the defendant was convicted of assault with intent to murder with malice. In that
case, an officer went to the defendant’s home to warn him to stay away from a neighbor’s
house. Although he was in his house when the officer arrived, the defendant refused to
let the officer in or to exit the house himself. He also “talked as if he ‘didn’t have the
right sense’ or was ‘cracking up,’ indirectly threatened the neighbor and laughed.” When
three more officers arrived at the scene, the defendant came out of the house with a rifle. 
The officers told him to drop the rifle, but he ran around his house instead, and the
officers ran after him. The defendant “turned as he ran and shot his rifle and the officers
heard the bullet ‘whistle’ by them.” He continued running and was trying to reload his
rifle when the officers caught him. King, 166 Tex. Crim. at 230-31, 312 S.W.2d at 677. 
Without mentioning its reasons, the court stated, “From a careful consideration of these
facts, we are unable to reach the conclusion that they are sufficient to show [the
defendant] guilty of the offense of assault with intent to murder with malice.” Id. at 231,
312 S.W.2d at 677-78.
           Twenty-eight years later, the court considered the effect of King in a prosecution
for the attempted capital murder of a peace officer. See Godsey v. State, 719 S.W.2d 578,
580-82 (Tex. Crim. App. 1986). In Godsey, the appellant aimed a gun at several officers. 
Id. at 580. There was evidence that he was suicidal. Id. The appellant relied on King to
support his argument that the State failed to prove he had the specific intent to kill. Id. at
581. The court addressed this contention as follows:
[King] was a prosecution for assault with intent to murder with malice. 
While the opinion is not clear on what basis the evidence was insufficient, it
seems evident that malice was not proved. Malice requires cool, deliberate
action or premeditation. The sheriff stated that the defendant talked as if he
were “cracking up.” Thus, although not specifically stated, it appears that
the evidence was insufficient to that extent. The court did not address or
discuss specific intent to kill, which could be present despite the absence of
malice. King, does not support appellant’s contention that specific intent
was found to be lacking in King and therefore, by comparison, is not shown
by the facts of the instant case.

Id. at 581-82 (citations omitted). The court further held that the evidence was legally
sufficient to establish that the appellant had the specific intent to kill, stating:
Appellant was not merely waving the gun around. He deliberately pulled it
out, after seeing the armed officers with their guns pointed at him. He
ignored their orders not to draw the gun and then to drop the gun. And,
finally, he pointed the gun in such a way that it was almost as if he were
‘drawing a bead’ on [the officers]. In addition, the jury heard the evidence
about appellant’s suicide wishes. The inference to be gotten from the
evidence and one which supports an intent to kill, is that appellant could
have decided to shoot the officers so that they would then shoot him.

Id. at 583. Based on the reasoning in Godsey, we conclude that King is distinguishable
from this case and that the evidence was legally sufficient to establish the specific intent
to kill.
           The other cases cited by Robbins are also distinguishable. In both Davis v. State,
516 S.W.2d 157, 160 (Tex. Crim. App. 1974), and Neal v. State, 534 S.W.2d 675, 675-76
(Tex. Crim. App. 1975), there was no evidence that the defendants pointed the guns,
much less fired them. In Sloan v. State, 76 S.W. 922, 922-23 (Tex. Crim. App. 1903) and
Ginn v. State, 128 Tex. Crim. 109, 110-11, 79 S.W.2d 327, 327-28 (1935), the evidence
indicated that the guns were incapable of killing the purported victims under the
circumstances in which they were used. In Brown v. State, 142 Tex. Crim. 405, 405, 408,
154 S.W.2d 464, 464-65 (1941), the defendant was only charged with threatening to take
the life of the purported victim, and he only pointed the gun without firing it. See
Godsey, 719 S.W.2d at 582 (discussing and distinguishing Davis, Neal, Sloan, Ginn, and
Brown).



The Aggravated Assault Counts
           The assault statute provides:
(a) A person commits an offense if the person:
 
(1) intentionally, knowingly, or recklessly causes bodily injury
to another, including the person’s spouse;
 
(2) intentionally or knowingly threatens another with
imminent bodily injury, including the person’s spouse; or
 
(3) intentionally or knowingly causes physical contact with
another when the person knows or should reasonably believe that the
other will regard the contact as offensive or provocative.

Tex. Pen. Code Ann. § 22.01(a) (Vernon Supp. 2004) (emphasis added). The 

aggravated assault statute provides:
(a) A person commits an offense if the person commits assault as
defined in § 22.01 and the person:
 
(1) causes serious bodily injury to another, including the
person’s spouse; or
 
(2) uses or exhibits a deadly weapon during the commission
of the assault.

Id. § 22.02(a) (emphasis added).
           It is apparent from these statutes that an aggravated assault may be committed in
several different ways. In this case, the indictment alleged that Robbins intentionally and
knowingly threatened Officers Reveles and Contreras with imminent bodily injury and
that he used and exhibited a deadly weapon--a firearm--during the commission of the
assault. Tracking the indictment, the jury charge authorized a conviction only if the jury
found that Robbins intentionally or knowingly threatened Reveles and Contreras with
imminent bodily injury while using or exhibiting a firearm. Thus, Robbins was charged
with aggravated assault pursuant to sections 22.01(a)(2) and 22.02(a)(2).
           Robbins argues that the evidence is legally insufficient because there is no
evidence that he intended to cause bodily injury or serious bodily injury to the officers. 
But Robbins was not charged with committing aggravated assault by causing bodily
injury or serious bodily injury; he was charged with committing aggravated assault by
threatening the officers with bodily injury while using or exhibiting a firearm. Therefore,
whether Robbins actually intended to cause bodily injury is irrelevant.
           As noted in our discussion of the attempted capital murder counts, both Reveles
and Contreras were stationed near the ARV and there is evidence that both of them were
in the line of fire when Robbins pointed and shot his gun in the direction of the ARV. 
From this evidence, a rational jury could find, beyond a reasonable doubt, that Robbins
intentionally or knowingly threatened the officers with bodily injury while using a
firearm. See Cantu v. State, 953 S.W.2d 772, 775 (Tex. App.--Corpus Christi 1997, pet.
ref’d) (holding that evidence that the defendant pointed a loaded gun at an officer was
legally sufficient to support a conviction for aggravated assault).
           Robbins’s first issue is overruled.
 

Jury Argument 
           In his second issue, Robbins argues that during closing argument at the
guilt/innocence phase the prosecutor improperly suggested that he should be punished in
accordance with the law-enforcement community’s expectations and to the same degree
as a murderer or rapist. The complained-of argument appears in the record as follows: 
Lastly, ladies and gentlemen, your word is going to send a message
to the police of this city, it really will. What kind of message will it send? 
How much do their lives mean to you? That’s the message you’ll be
sending. Is it part of their job to be shot at? Do you not care if they’re shot
at? Do you care? You’re a representative of the community, and your
verdict is going to send a message to all those men seated right over there.
 
I’m going to end with you, ladies and gentlemen, just very simply. 
You--all the time you hear terrible stories of crime and rape and murder on
the media. And I’m sure some of you at one time have asked why doesn’t
someone do something about it, why doesn’t someone make America a
better place.
 
[Defense Counsel:] Your Honor, I’m going to object to this line of
argument. He’s not being punished for the problems in America. We’re
here for this indictment, these 15 counts in this indictment, Your Honor.
 
[Prosecutor:] Your Honor, it’s a plea for law enforcement.
 
The Court: Yes, sir. I’ll overrule the objection.
 
[Prosecutor:] I’m sure at one time you asked why didn’t someone do
something about it. Well, as you sit here today, you are that somebody. 
You can do something about it today. And by your verdict you’ll say does
El Paso County want a man like Mark Robbins living here?

           To determine whether the prosecutor made an improper argument, we must
consider the entire argument, not merely isolated sentences. Rodriguez, 90 S.W.3d at 
364. The prosecutor may express an opinion on the serious nature of the offense by
contrasting it with other cases or crimes in general, as long as the prosecutor does not
delve into the details of the other cases or crimes. Id. The prosecutor may also make a
plea for law enforcement. Borjan v. State, 787 S.W.2d 53, 55-56 (Tex. Crim. App. 1990);
Rodriguez, 90 S.W.3d at 364. A plea for law enforcement may take many forms, one of
which is to argue the relationship between the jury’s verdict and the deterrence of specific
crimes or crime in general. Borjan, 787 S.W.2d at 55. The State may also remind the
jury of the effect that its verdict may have on specific segments of the community or the
community in general. Id. at 56. Thus, the State may ask the jury to represent the
community or to send a message to the community. Harris v. State, 122 S.W.3d 871,
887-88 (Tex. App.--Fort Worth 2003, no pet.). The State may not, however, argue that
the community or a specific segment of the community expects or demands a particular
verdict or a particular punishment. Borjan, 787 S.W.2d at 56; Cortez v. State, 683
S.W.2d 419, 420-21 (Tex. Crim. App. 1984); Rodriguez, 90 S.W.3d at 365.
           Robbins did not object to the prosecutor’s argument on the ground that it was an
improper community expectation argument. Therefore, he has waived his argument in
this regard. See Mathis v. State, 67 S.W.3d 918, 926-27 (Tex. Crim. App. 2002);
Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); Harnett v. State, 38 S.W.3d
650, 661 (Tex. App.--Austin 2000, pet. ref’d).
           In any event, the prosecutor’s argument did not suggest that the community or
police officers expected or demanded a guilty verdict or a particular punishment. Instead,
it was an invitation to the jury to represent the community and to send a message to the
officers that it values their service and their lives. The Court of Criminal Appeals
approved of a similar argument in a case in which the defendant was charged with
shooting at a police officer. See Rhodes v. State, 450 S.W.2d 329, 330-31 (Tex. Crim.
App. 1970). In that case, the prosecutor made the following argument:
You can, on the one hand, say to [the officer] . . . and all of the rest of them
with the Houston Police Department: ‘You may go and do the best you can
to stop crime. We don’t mind if you get shot; we don’t care, and we are not
going to support law enforcement in this county.’ Or by your verdict you
may say, ‘Officer . . . and those that serve with you, we are proud of you
and we appreciate what you are doing for us. We want to help in every way
that we can. When [the defendant] takes his pistol and tries to kill you, we
are going to support you and find him guilty of the offense . . . , because this
is what he did.’

Id. at 331-32. The court held that this was a proper plea for law enforcement. Id. at 332.
           As for the prosecutor’s references to rape and murder, these references were made
within the context of an argument on the relationship between the jury’s verdict and the
deterrence of crime in general. The prosecutor did not delve into detail about these other
crimes. Accordingly, we conclude that the argument was a proper plea for law
enforcement.
           Robbins’s second issue is overruled.
 

Conclusion
           For the reasons stated herein, the judgment of the trial court is affirmed.
 
                                                                  SUSAN LARSEN, Justice
August 12, 2004

Before Panel No. 1
Larsen, McClure, and Chew, JJ.

(Publish)