

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-17-00154-CR

———————————————————

ALAN PATRICK FOWLER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1495202R

---

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

In a single point, Appellant Alan Patrick Fowler appeals his conviction for the attempted murder of his former boss. *See* Tex. Penal Code Ann. §§ 15.01, 19.02 (West 2011). We affirm.

## Background

### I. The night of the incident

On the night of August 9, 2016, Lisa Lane was home alone with her two small dogs, her husband Kevin having left that afternoon for a business trip. She went to bed at about 11:00 p.m. but awoke around 1:00 a.m. and was profusely sweating. She knew immediately that her air conditioner was not working, but she assumed that the electricity had gone out due to a nearby car accident or similar incident and went back to sleep.

But at around 4:00 a.m., Lisa was startled awake by the sound of her alarm's door chime and then the "blaring" sound of the full alarm. She immediately thought, "Someone is in my house. The door has been opened. Someone is physically in my house." She realized that she had left her cell phone—the only functioning phone in the house—in the living room, so she sprinted to the living room. When she unsuccessfully tried to turn on the lights in the living room, she realized that the power really was completely out. Shaken by the realization that she had no power and that someone was in her house, Lisa grabbed her cell phone, raced back to her bedroom, and screamed, "Get the he[ll] out of my house[!]" at the top of her lungs.

Lisa then called the alarm company and asked them to call the police, but she also called the police herself once she hung up with the alarm company.

Police quickly arrived at the house and discovered Fowler crouching in the backyard kitchen and a bullet hole through the nearby window to the Lanes' game room. Fowler admitted to one of the officers that he had driven from Shreveport to Southlake that night in order to "try to scare" Kevin, his former boss at the major accounting firm Deloitte & Touche.

## II. Fowler's history with Kevin

Fowler, a CPA, joined Deloitte as a consultant in 2006 and traveled all over the world for his work in the ensuing years. By 2014, Fowler had tired of the international travel and requested a position closer to his family home in Shreveport, Louisiana. Deloitte agreed that he could live in Shreveport and work out of Deloitte's Dallas office with Kevin as his manager.

Initially, Fowler was a key employee in managing one of Deloitte's major emerging clients, 7-Eleven convenience stores, and he and Kevin developed a working and social relationship. But his work performance began to suffer in January 2015 when he began missing work and failing to show up to work as scheduled. By July 2015, Fowler elected to use his vacation time for an indefinite leave, but he did not disclose to Deloitte that he was suffering from depression.

Not long after Fowler elected to take an indefinite leave, Deloitte discovered that Fowler had made a number of high-dollar, unauthorized expense charges on the

7-Eleven account, including $8,000 to $10,000 for a personal trip to St. Martin, $3,000 to $4,000 for a sporting event in Las Vegas, and two $5,000 gift cards. Deloitte terminated Fowler's employment in August 2015.

In November 2015, Fowler filed a federal lawsuit against Deloitte, in which he claimed that Deloitte retaliated against him for having a disability. Kevin was the focus of Fowler's complaints; according to Deloitte's general counsel, Fowler blamed Kevin for his firing. That lawsuit was dismissed in April 2017.

## III. The police investigation

Once police arrested Fowler, they searched the outside of the Lanes' house and discovered that the electric meter had been removed and was lying on the ground. Later, Lisa found a small bag tucked underneath the sink in the outdoor kitchen; the bag contained channel lock pliers, razor blades, and a multi-purpose tool, and behind the bag was a 9-millimeter handgun with a homemade oil-filter silencer attached to it and a spare, loaded magazine. The gun was loaded with a round in the chamber. In total, there were 19 bullets found with the gun. Southlake Police determined that a twentieth bullet found inside the home had been fired by the 9-millimeter gun found under the outdoor sink.

The police located Fowler's car, a Chevrolet Tahoe, in the parking lot of a nearby high school, with its hood slightly open and a pair of jumper cables hanging

4

from the passenger-side rearview mirror.  Inside the vehicle,[1] police found two pairs of rubber gloves, a spent shell casing, two boxes of Fiocchi subsonic 9-millimeter ammunition, an iPad, and a document detailing Fowler's complaints against Deloitte and his plans to arrange for billboards to be posted that disparaged Deloitte.

A search of Fowler's Shreveport home uncovered two more boxes of Fiocchi subsonic 9-millimeter ammunition, other loose and boxed 9-millimeter ammunition, a factory box for the 9-millimeter pistol matching the serial number on the gun found in the Lanes' outdoor kitchen, and a receipt for the purchase of 1,000 rounds of Fiocchi subsonic 9-millimeter ammunition.  Police also recovered Fowler's computer.

Among the evidence discovered on Fowler's iPad, on his cell phone, and at his house were web search histories inquiring how to construct a silencer out of an oil filter and webpages with instructions for the same, as well as boxes from oil filters and cans of black spray paint used to paint the oil filter.  The instructions, boxes, and spray paint matched the homemade oil-filter silencer that was attached to the 9-millimeter gun found in the outdoor kitchen.

Additional evidence recovered from Fowler's computer and iPad included the following:

- a three-page document outlining Fowler's work with Deloitte, referencing "[f]alse allegations" made by Kevin, and containing the phrase, "Judge, Jury[,] and Executioner";

---

[1]Searches of Fowler's vehicle, home, iPad, and computer hard drive were conducted pursuant to search warrants.

- the electronic version of the document found in Fowler's vehicle which detailed his complaints against Deloitte and Kevin and mentioned his plans to arrange for billboards that would disparage Deloitte;

- a background report on Kevin;

- Google searches for firearm stores, "Kevin Lane," "Lisa Lane," "company credit card fraud," home power meters and home electricity meters, the terms "judge, jury[,] and executioner" and "vigilante," credit card fraud laws, hardware location of the On-Star feature of a Chevrolet Tahoe and how to disable it, and "deloitte kevin lane,"

- Several visits to Google Maps to view locations in Southlake, the Lanes' home, street view angles of the Lanes' home, and satellite images of the Lanes' home;

- Visits to webpages regarding gun stores and how to buy a gun; and

- Amazon searches for "Razor knife" and visits to Amazon pages selling pocketknives, including the pocketknife in Fowler's possession at the time of arrest.

Fowler was charged with attempted capital murder by retaliation, attempted capital murder by burglary, attempted murder, assault of Lisa with a deadly weapon, and reckless discharge of a firearm. *See* Tex. Penal Code Ann. §§ 15.01, 19.02, 22.05(b)(2) (West 2011), §§ 19.03, 22.01(a)(2) (West Supp. 2017).

## IV. The trial

### A. Fowler's testimony at trial

At trial, Fowler presented his side of the story. Fowler claimed that, influenced by his state of depression, he had driven from Shreveport to Southlake in the middle of the night with a plan to kill himself in the Lanes' backyard. He testified that he

6

wanted to "scare" Kevin and bring attention to mental health issues. In his version of events, after he removed the electric meter, an outdoor chair cushion, and a window screen, he accidentally discharged the gun when he was trying to open the game-room window. He claimed that the homemade oil-filter suppressor was intended to protect his ears whenever he would shoot his gun at the gun range.

## B. The jury's verdict

At the close of the five-day guilt/innocence phase of the trial, the jury convicted Fowler of attempted murder of Kevin and found that he had used a deadly weapon. After the punishment trial, the jury assessed a 20-year sentence.

## Discussion

Fowler presents a single point on appeal. In short, he argues that he should not have been convicted of attempted murder because Kevin was not present in the home on the night of the incident. To use his words, the evidence is insufficient to prove attempted murder because Kevin was not present and Fowler did not "raise, point[,] or fire the gun at any person." We affirm the trial court's judgment.

## I. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This

7

standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does

8

not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

## II. Application

To support Fowler's conviction, the evidence must show that Fowler acted with a specific intent to murder Kevin and did "an act amounting to more than mere preparation" that tended to affect the commission of murder—intentionally or knowingly causing Kevin's death. Tex. Penal Code Ann. § 15.01 (defining criminal attempt), § 19.01 (West 2011) (defining murder); *Flanagan v. State*, 675 S.W.2d 734, 740 (Tex. Crim. App. [Panel Op.] 1982). Fowler argues on appeal that the evidence admitted at trial did not show he acted with a specific, murderous intent and that the evidence did not show anything beyond mere preparation because Fowler could not

9

have killed Kevin in light of his physical absence from the home on the night of the incident.

Because intent is inherently difficult to prove with direct evidence, the jury may "infer intent from any facts in evidence which it determines proves the existence of [an] intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 938 (2004). Attempted murder in particular does not require actual physical harm to the intended victim to support a finding of specific intent. *Moreno v. State*, 755 S.W.2d 866, 869 (Tex. Crim. App. 1988).

There was a plethora of evidence presented in this case from which the jury could infer Fowler's intent to kill Kevin. The jury heard testimony and was presented with exhibits that evidenced Fowler's extensive research and planning, including:

- researching maps, satellite images, and Google street view images of the Lanes' house and the area around it;

- conducting a background check of Kevin;

- a ten-page manifesto outlining Fowler's complaints against Kevin and blaming him for his termination from Deloitte;

- a three-page manifesto outlining his complaints against Deloitte;

- conducting Google searches for several alarming terms, including "vigilante," "murderer," and "murder";

- conducting Google searches regarding purchasing firearms;

- conducting Google searches regarding the legality of silencers;

10

- researching how to make a homemade silencer out of an oil filter;

- conducting Google searches relating to home power meters; and

- researching how to disable the On-Star GPS system in Fowler's Chevrolet Tahoe.

The evidence also established that Fowler purchased the 9-millimeter gun that was found beneath the outdoor sink with a homemade silencer attached to it as well as subsonic ammunition—ammunition that is designed to be quieter than standard ammunition.[2] An examination of the bullet that had been shot through the window matched it to Fowler's 9-millimeter gun.

Finally, the jury heard testimony regarding the events leading up to August 9, 2016, including Fowler's troubled history with and departure from Deloitte, establishing a possible motive for Fowler to murder Kevin. The jury was in the best position to weigh the credibility of the witnesses and the evidence before it. *See Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 556 U.S. 1211 (2009). This evidence was sufficient to establish Fowler's intent to murder Kevin. *Cf. Bush v. State*, No. PD-1012-16, 2018 WL 2041439, at *4–6 (Tex. Crim. App. May 2, 2018) (not designated for publication) (holding evidence was sufficient to establish an intent

---

[2]Jamie Becker, a firearm examiner with the Tarrant County Medical Examiner's Office, testified at trial that subsonic ammunition is designed to be heavier and slower, and therefore quieter. As Becker testified, "Military uses it so that they don't give away their position. You want to be stealthy."

to kidnap murder victim where it included internet research of how to drug a person to the point of unconsciousness and missing person protocol).

This evidence of Fowler's intent is not negated by the fact that Kevin was not home that night. Simply put, factual impossibility is not a defense to a charge of an attempted crime. *See Chen v. State*, 42 S.W.3d 926, 930 (Tex. Crim. App. 2001) ("[I]t is immaterial whether the attempted crime is impossible of completion if . . . completion was apparently possible to the defendant who was acting with the intent to commit the crime . . . ."); *see also Herring v. State*, No. 02-12-00546-CR, 2014 WL 173481, at *4 (Tex. App.—Fort Worth Jan. 16, 2014, pet. ref'd) (mem. op., not designated for publication). The defendant's intent—not whether he could carry out that intent—is the "critical element in attempt offenses." *Chen*, 42 S.W.3d at 930 n.2. An attempt conviction may therefore stand "where the completion of the crime was 'apparently possible' to the defendant, even if the completion of the crime was not actually possible." *Herring*, 2014 WL 173481, at *4 (citing *Chen*, 42 S.W.3d at 930). Appellant admitted at trial that he did not know that Kevin was out of town on the night of August 9. Combining this with the evidence of Fowler's intent to murder Kevin, Kevin's actual absence is irrelevant. *See id.* at *4–7 (upholding attempted murder conviction despite the fact that the tractor the defendant was driving at a police officer may have been incapable of killing the officer); *see also Chen*, 42 S.W.3d at 930–31 (upholding conviction for attempted sexual performance by a child even though the person with whom the defendant had conversed online was not actually a child).

12

We therefore overrule Fowler's sole point.

## Conclusion

Having overruled Fowler's sole point, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 4, 2018

13